## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

PAUL GILLPATRICK and NICCOLE
WETHERELL,

      Plaintiffs,

   v.

SCOTT FRAKES, DIRECTOR,
ANGELA FOLTS-OBERLE, ACTING
WARDEN, and MICHELE CAPPS,
WARDEN, in their official
capacities,

      Defendants.

Case No. 4:18-cv-03011

DEFENDANTS' BRIEF IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

### INTRODUCTION

Scott Frakes, Angela Folta-Oberle, and Michele Capps (in their official capacities) (collectively "the Defendants"), pursuant to Fed. R. Civ. P. 56 and NECivR 56.1, submit this brief in support of their motion for summary judgment on all claims. There is no genuine dispute as to any material fact and the Defendants are entitled to judgment as a matter of law. The Defendants' denial of the marriage requests by the Plaintiffs—both of whom are state inmates serving lengthy sentences for murder in separate prisons—is constitutionally valid because it is reasonably related to legitimate penological interests, consistent with *Turner v. Safley*, 482 U.S. 78 (1987).

The Plaintiffs have not facially challenged the constitutionality of any Nebraska law, regulation, or policy. Rather, their challenge is to the Defendants' denial of their particular marriage request. The uncontroverted record—developed chiefly

1

through the testimony of corrections officials with decades of experience running prisons—establishes that the burden on the Plaintiffs' marriage right is permissible when considered against a variety of legitimate legal, institutional, and security concerns. The Plaintiffs' primary argument would have this Court write "presence" out of Nebraska's marriage statutes by compelling the Defendants to facilitate a wedding ceremony by videoconference. Beyond that, any other conceivable means of accommodating the Plaintiffs' desire to marry would compromise institutional security. Under the deferential legal standard that will guide the Court's analysis, this provides ample justification for the denial of the Plaintiffs' requests.

For these reasons and as explained further throughout this brief, the Court should decline the Plaintiffs' invitation to second-guess the legal and security concerns of state correctional officials and grant the Defendants summary judgment on all claims.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In reviewing a motion for summary judgment, the Court views the facts in the light most favorable to the non-moving party and gives that party "the benefit of all reasonable inferences that can be drawn from the record." *State Nat'l Ins. Co., Inc. v. Washington Int'l Ins. Co.*, 304 F. Supp. 3d 827, 831-32 (D. Neb. 2018) (quoting *Minnesota ex rel. N. Pac. Ctr., Inc. v. BNSF Ry. Co.* 686, F.3d 567, 571 (8th Cir. 2012)).

The initial burden on a moving party "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325; *see also Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018) ("The moving party can satisfy its burden in either of two ways: it can produce evidence negating an essential element of the nonmoving party's case, or it can show that the nonmoving party does not have enough evidence of an essential element of its claim to carry its ultimate burden of persuasion at trial."); *Johnson v. Wheeling Mach. Prods.*, 779 F.3d 514, 517 (8th Cir. 2015) (moving party need not produce evidence showing "the absence of a genuine issue of material fact").

In response to the moving party's showing, the nonmoving party's burden is to produce "specific facts sufficient to raise a genuine issue for trial." *Haggenmiller v. ABM Parking Servs., Inc.*, 837 F.3d 879, 884 (8th Cir. 2016) (quoting *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012)). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Wagner v. Gallup, Inc.*, 788 F.3d 877, 882 (8th Cir. 2015) (quoting *Torgerson*, 643 F.3d at 1042). "[T]here must be more than the mere existence of some alleged factual dispute" between the parties in order to overcome summary judgment. *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting *Vacca v. Viacom Broad. of Mo., Inc.*, 875 F.2d 1337, 1339 (8th Cir. 1989)).

**STATEMENT OF MATERIAL FACTS ABOUT WHICH THE DEFENDANTS CONTEND THERE IS NO GENUINE DISPUTE[1]**

<u>*Relevant persons*</u>

1. Plaintiff Paul Gillpatrick is a Nebraska inmate serving a 55 to 90 year effective sentence at the Nebraska State Penitentiary ("NSP") for the 2009 murder of Robby Robinson and for the use of a deadly weapon to commit a felony. *State v. Gillpatrick,* No. A-10-793, 2011 WL 2577279, at *1 (Neb. Ct. App. Jun. 28, 2011); (Second Amended Complaint ("2d Am. Compl.") ¶ 1, Filing 1-1 at 1.)

2. Based on Plaintiff Gillpatrick's sentence structure, he cannot be transferred out of a medium or maximum-security facility (*e.g.*, on furlough or to the work release center). (Deposition of Diane Sabatka-Rine ("Sabatka-Rine Depo.") 18:2-12.)

3. Plaintiff Niccole Wetherell is a Nebraska inmate serving a life sentence at the Nebraska Correctional Center for Women ("NCCW") for the 1998 murder of Scott Catenacci. *State v. Wetherell,* 259 Neb. 341-42 (2000); (2d Am. Compl. ¶ 1, Filing 1-1 at 1.)

4. Based on Plaintiff Wetherell's sentence structure, she cannot be transferred out of a medium or maximum security facility (*e.g.*, on furlough or to the work release center). (Sabatka-Rine Depo. 19:3-13.)

5. Defendant Scott Frakes is the Director of the Nebraska Department of Correctional Services ("NDCS"). (2d Am. Compl. ¶ 2, Filing 1-1 at 1.)

---

[1] Elsewhere in the brief, references to items in this statement of uncontroverted fact will be made using the format "Statement #."

6. Director Frakes is the ultimate decisionmaker with regard to inmate-to-inmate marriage issues, generally, and to the issue of transporting an inmate from one secure facility to another for the purpose of marriage, specifically. (Depo. Ex. 2 at 4; Depo. Ex. 5, Inmate Marriage Policy pt. I-D; Sabatka-Rine Depo. 62-2-5.)

7. Diane Sabatka-Rine is the Chief of Operations for NDCS. (Sabatka-Rine Depo. 5:12-15.)

8. Defendant Michele Capps is the Warden of NSP. (Filing 41 at 1.)

9. Defendant Angela Folts-Oberle is the Acting Warden of NCCW. (Filing 45 at 1.)

*Relevant history*

10. The Plaintiffs are engaged to be married. (2d Am. Compl. ¶ 7, Filing 1-1 at 2.)

11. Sometime prior to August 12, 2012, Plaintiff Wetherell submitted a request to marry Plaintiff Gillpatrick. (2d Am. Compl. ¶¶ 20-22, Filing 1-1 at 3.)

12. The then-Warden of NCCW denied Plaintiff Wetherell's marriage request. (2d Am. Compl. ¶ 21, Filing 1-1 at 3.)

13. On August 12, 2012, Plaintiff Wetherell initiated the inmate grievance process regarding the denial of her marriage request. (2d Am. Compl. ¶ 22, Filing 1-1 at 3.)

14. On or about September 14, 2012, Plaintiff Wetherell's grievance process was completed with NDCS affirming the NCCW Warden's decision to deny the marriage request. (2d Am. Compl. ¶ 23, Filing 1-1 at 3.)

15. Sometime prior to July 26, 2013, Plaintiff Gillpatrick submitted a request to marry Plaintiff Wetherell. (2d Am. Compl. ¶¶ 16-18, Filing 1-1 at 3.)

16. The then-Warden of NSP (Diane Sabatka-Rine) denied Plaintiff Gillpatrick's marriage request. (2d Am. Compl. ¶ 17, Filing 1-1 at 3.)

17. On July 26, 2013, Plaintiff Gillpatrick initiated the grievance process regarding the denial of his marriage request. (2d Am. Compl. ¶ 18, Filing 1-1 at 3.)

18. On or about September 4, 2014, Plaintiff Gillpatrick's grievance process was completed with NDCS affirming the NSP Warden's decision to deny the marriage request. (2d Am. Compl. ¶ 19, Filing 1-1 at 3.)

19. Separate from the Plaintiffs' respective grievance proceedings, on April 15, 2013, NDCS counsel, writing on behalf of former NDCS Director Robert Houston, advised the Plaintiffs that "... legal and security concerns prohibit the NDCS from facilitating a marriage ceremony for inmates Gillpatrick and Wetherell." (2d Am. Compl. ¶ 24, Filing 1-1 at 3.)

20. On December 30, 2013, the Plaintiffs raised the issue with Director Houston's successor, Michael L. Kenney, who affirmed the previous denials. (2d Am. Compl. ¶¶ 26-27, Filing 1-1 at 4.)

21. Defendant Frakes has since succeeded Michael L. Kenney as NDCS Director. (2d Am. Compl. ¶ 25, Filing 1-1 at 4.)

22. Aside from NDCS' denials of their marriage requests, the Plaintiffs are otherwise eligible to marry. (2d Am. Compl. ¶¶ 5-6, 8, Filing 1-1 at 2.)

23. It is undisputed that the current relevant officials at NDCS stand by the denial of the Plaintiffs' marriage requests and that the Plaintiffs will not be permitted to marry for the reasons already provided in the previous denials and based on current NDCS policy. (Sabatka-Rine Depo. 74:6-75:1; Depo. Ex. 2, Defendants' Responses to Interrogatories; Depo. Ex. 5, NDCS Inmate Marriage Policy.)

24. Prior to the removal of this action to this Court, earlier iterations of the Plaintiffs' claims were subject to litigation in state court, (*see*, *e.g.*, Filing 6 and attachments), which culminated in a published opinion of the Nebraska Supreme Court. *Gillpatrick v. Sabatka-Rine*, 297 Neb. 880, 902 N.W.2d 115 (2017). The Nebraska Supreme Court reversed and vacated on procedural grounds the state district court's earlier decision granting the Plaintiffs' claims to marry, but did not address the merits of the Plaintiffs' underlying constitutional claims. *See id*. Other than strictly for background purposes, the state court proceedings are immaterial to the issues before this Court.

*Basis for the denial of the Plaintiffs' marriage requests*

25. Inmate marriages are governed by the NDCS Inmate Marriage Policy, Policy #205.04, which is in the record at Depo. Ex. 5 (also available at: https://corrections.nebraska.gov/system/files/rules_reg_files/205.04_2018.pdf). The Inmate Marriage Policy was made effective June 30, 2016, and most recently revised on December 31, 2018.

26. The Inmate Marriage Policy as a whole speaks for itself, but several of its provisions are particularly pertinent to this motion:

PURPOSE: The purpose of this Policy is to establish rules and standards for accommodating inmate marriages.

GENERAL: The Nebraska Department of Correctional Services (NDCS) shall accommodate inmate marriage ceremonies *provided the marriage does not conflict with any legal restriction or process, any NDCS policy or procedure, or compromise the security or good order of any NDCS facility*.

. . . .

PROCEDURE:

I. Marriage

A. If *all legal* and NDCS requirements are met, inmates will be allowed to marry unless the Warden finds that the marriage or marriage ceremony presents a threat to security or the good order of the institution.

. . . .

D. Facilities will arrange space and time for marriage ceremonies, except that ceremonies will not be arranged for inmates assigned to restrictive housing. Inmates assigned to community custody facilities may be allowed furloughs to marry in the community. *NDCS will not transport inmates from one institution to another for the marriage ceremony. Inmates will normally not be permitted to marry other inmates due to potential risks to the safety, security or good order of the facility*. If an inmate wants to marry another inmate, he or she may file

a grievance of a sensitive nature to the Director outlining special circumstances which may warrant an exception. *The director reserves the right to approve inmate-to-inmate marriages in the case of special circumstances.*

(Depo. Ex. 2 at 2 (emphasis added).)

27. On its face, the Inmate Marriage Policy does not categorically bar inmate-to-inmate marriages, but rather establishes a default rule that such marriages will generally not be permitted unless an exception is made in a case of "special circumstances." (*Id.*)

28. The "special circumstances" are not specifically enumerated, but Director Frakes testified that circumstances that could qualify for this exception might include situations involving permitting two inmates to marry for the benefit a child or possibly a situation presenting a special inmate asset disposition need. (Frakes Depo. 34:22-36:14.)

29. Chief of Operations Sabatka-Rine provided similar testimony on this point, and elaborated that any such decision would be made based on the totality of the circumstances in a particular situation. (Sabatka-Rine Depo. 61:13-62:22.)

30. The record is devoid of any assertion by the Plaintiffs that special circumstances apply to their request to be married.

31. The specific reasons for NDCS' denial of the Plaintiffs' marriage requests has been restated in various forms in the years since this dispute arose, but, for purposes of this motion, those reasons have been consolidated into the Defendants' responses to the Plaintiffs' first set of interrogatories, which include:

a. INTERROGATORY NO. 2: Please describe in detail what the "legal and security concerns" were at the time the decision was made to deny Plaintiffs request to marry and describe how these concerns have changed over time until the present.

ANSWER: Nebraska law requires parties to be "in the presence of the magistrate or minister and the attending witnesses" in order to be married. The security concerns associated with transporting either Plaintiff for the purpose of attending a marriage ceremony include the increased risk and motivation for escape because both Plaintiffs are serving long prison sentences; the fact that the distance between the Plaintiffs would require transporting one Plaintiff through multiple jurisdictions; and the increased risk of escape when inmates are traveling at a time that is known in advance to the inmate. Other security concerns include the strain on staff resources because of the need for more staff to be involved in the transport, and the increased risk to the public by transporting inmates who are at an increased risk of escape. These concerns have remained over time.

b. INTERROGATORY NO. 4: Identify any fact, policy, reason, or basis (including any scientific evidence) that Defendants believe or contend supports the position that prohibiting Plaintiffs from marrying furthers any state interest, including but not limited to "legal and security concerns."

ANSWER: In addition to Defendant's response to Interrogatory No. 2 above, Defendants contend that relationships among inmates in prisons can be coercive in nature, and create additional security issues.

c.  INTERROGATORY NO. 5: If you assert that one or more legitimate government interests exist that prevent the Plaintiffs' marriage, please describe in detail each interest and how allowing Plaintiffs to marry would affect that interest.

ANSWER: Defendants have an interest in expending state resources (staff salaries, vehicles, gas) appropriately, maintaining minimum staffing levels in the facilities, limiting inmate movement from secure facilities into the community, and complying with statutes. Defendants also have an interest in keeping inmates safe, free from coercion perpetrated on one another.  Defendants also have an interest in maintaining the ability to make decisions that will impact the good order of the institution and preclude inmate-inmate communications that could present security and investigatory problems.

d.  INTERROGATORY NO. 6: Please describe in detail what impact allowing Plaintiffs to marry was expected to have on prison staff, inmates, and prison resources at the time the decision was made and how these impacts have changed over time until the present time.

ANSWER: [T]ransporting either Plaintiff to a different facility would require a minimum of 2 staff.  A law enforcement chase vehicle would

also potentially be required. Because staff would be out of the facility transporting the Plaintiffs, other staff may have to work overtime, or have a day off cancelled to cover the transporting staffs' duties.

(Depo. Ex. 2, Defendants' Responses to Interrogatories.)

32. Director Frakes' testimony was consistent with those responses and confirmed that the transportation issue was at the center of the basis for denying the marriage requests. (Deposition of Scott R. Frakes ("Frakes Depo.") 82:15-83:5.)

33. Chief of Operations Sabatka-Rine likewise testified that the above-discussed transportation issue is, standing alone, a sufficient justification for denying the Plaintiffs' marriage requests. (Sabatka-Rine Depo. 36:5-13.)

34. NSP Warden Capps likewise testified that as long as both Plaintiffs maintained their current sentence structures, and unless or until one of them obtained a sentence reduction or a move to a lower custody facility, the security risks associated with moving either of them for purposes of marriage prevent her from being willing to approve Plaintiff Gillpatrick's request. Capps Depo. 29:1-30:13.)

35. Even in circumstances where transportation would not be an issue, other security and institutional-related considerations exist which would influence NDCS officials' decision regarding a requested inmate-inmate marriage, including the concern of whether an inmate is being coerced to marry another inmate, and inmate health. (Sabatka-Rine Depo. 36:14-37:6.)

36. Inmate-on-inmate coercion can occur in the prison setting even if the two individuals are not housed in the same facility. (Sabatka-Rine Depo. 42:1-18.)

37. Based on their respective sentence structures, neither Plaintiff is eligible to receive permission to be transported for the purpose of getting marries. (Sabatka-Rine Depo. 18:13-20, 19:14-18.)

38. NDCS officials cannot approve a request for an inmate marriage by videoconference or by other means of electronic communication, based on NDCS officials' understanding that Nebraska law requires the parties to a marriage ceremony to be physically present. (Frakes Depo. 73:6-74:12.)

39. To reach their conclusions as to the reasons for denying these Plaintiffs' request to be married, the Defendants relied on their decades of collective experience working in prison systems. (Depo. Ex. 2 at 7; Sabatka-Rine Depo. 5:23-6:25; Frakes Depo. 4:23-6:19.)

40. To the knowledge of Chief of Operations Sabatka-Rine, there has never been an inmate-to-inmate marriage between two NDCS inmates while both were housed in secure facilities. (Sabatka-Rine Depo. 42:19-23.)

## ARGUMENT

**The denial of the Plaintiffs' marriage requests is constitutional.**

Consolidated and restated, the Plaintiffs' sole claim is that they are entitled under the Fourteenth Amendment to marry and that the Defendants' denial of their request to marry is unconstitutional. Since both Plaintiffs are violent offenders serving lengthy prison terms (one a life sentence) in separate NDCS facilities 54 miles

apart, it is implicit in their claim that NDCS would be compelled to take some affirmative act to facilitate their marriage ceremony. This would require either transporting one of the Plaintiffs outside a secure facility or, as the Plaintiffs have theorized in previous iterations of their claims, setting up a marriage ceremony by videoconference in spite of the requirement in Nebraska's marriage statute, Neb. Rev. Stat. § 42-109, that parties to the ceremony be "presen[t]" with the presider. *See Gillpatrick v. Sabatka-Rine*, 297 Neb. 880, 882-83, 902 N.W.2d 115, 119 (2017).

Although their pleadings are vague as to precisely the remedy the Plaintiffs want this Court to impose on the Defendants, the Defendants assume they remain committed to an injunction that would require the facilitation of a videoconference ceremony, notwithstanding Nebraska's presence requirement. That, at least, was the orientation of the Plaintiffs' argument before the Nebraska Supreme Court. Brief of Appellees at *2, 17-18, 28, *Gillpatrick v. Sabatka-Rine*, 297 Neb. 880, 902 N.W.2d 115 (2017) (No. S-16-212), 2016 WL 4938198. For the sake of completeness, this brief addresses both the videoconference theory and any new theory regarding forced transportation. If the Plaintiffs pursue the latter remedy in their principal brief, the Defendants will respond further in their opposition brief. Under either theory, however, the Plaintiffs' underlying constitutional claim is without merit.

It is not contested that even as incarcerated people, the Plaintiffs retain a right to marry that is protected by the Constitution. *Obergefell v. Hodges*, 135 S. Ct. 2584, 2598 (2015) (citing *Turner*, 482 U.S. at 95). The question here is not whether the right

exists, but rather whether it may be restricted in the prison setting. "Although prisoners retain their constitutional rights, limitations may be placed on the exercise of those rights in light of the needs of the penal system." *Murphy v. Mo. Dep't of Corr.,* 372 F.3d 979, 982 (8th Cir. 2004); *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) ("Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."). Thus, "[c]onstitutional claims that would otherwise receive strict scrutiny analysis if raised by a member of the [public] are evaluated under a lesser standard of scrutiny in the context of a prison setting." *Id.* (citing *Turner,* 482 U.S. at 81). "A prison regulation or action is valid, therefore, even if it restricts a prisoner's constitutional rights if it is 'reasonably related to legitimate penological interests." *Id.* (quoting *Turner,* 482 U.S. at 89).

*Turner* established "four factors that courts should consider in making that determination": (1) "whether there is a 'valid rational connection' between the prison regulation and the government interest justifying it"; (2) "whether there is an alternative means available to the prison inmates to exercise the right"; (3) "whether an accommodation would have 'a significant "ripple effect" ' on the guards, other inmates, and prison resources"; and (4) "whether there is an alternative that fully accommodates the prisoner 'at de minimis cost to valid penological interests.'" *Murphy,* 372 F.3d at 982-83 (quoting *Turner*, 482 U.S. at 89-90).

The Supreme Court has made clear a reviewing court "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). The Supreme Court has also made clear the burden is not on the state to provide the validity of a challenged regulation, but is instead on the inmate to disprove it. *Id*.

This deferential legal standard exists for good reason, since "[s]ubjecting day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." *Turner*, 482 U.S. at 89. "[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Id*. at 84 (internal quotation omitted). "[T]he problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree." *Id*. "Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Id*. at 84-85. "Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint." *Id*. at 85. And, where a state penal system is involved, federal courts have additional reason to accord deference to the appropriate prison authorities. *Id*.

Applying these principles to the uncontroverted record before the Court—and according Nebraska's prison administrators the deference the Supreme Court requires—it is clear that the denial of the Plaintiffs' marriage request satisfies the four-factor *Turner* framework.

**1. There is a valid, rational connection between the denial of the marriage requests and the Defendants' legitimate penological interests.**

The threshold question in measuring the reasonableness of a burden on an inmate's constitutional right is whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89 (internal quotation omitted). "[A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Id.* at 89-90. "[T]he governmental objective must be a legitimate and neutral one." *Id.* at 90.

To the extent the Plaintiffs' request to marry is based on their belief that the Defendants can accommodate them by simply setting up a videoconference for their wedding ceremony, the denial of the request is facially reasonable. It is obviously neither arbitrary nor irrational for the Defendants to decline to facilitate a legally invalid proceeding. As stated above, Nebraska law requires that in a valid marriage ceremony, "the parties shall solemnly declare *in the presence of* the magistrate or minister and the attending witnesses, that they take each other" as spouses. Neb. Rev. Stat. § 42-109 (emphasis added). The Plaintiffs can point to no Nebraska authority—and the Defendants are aware of none—which interprets "presence" to mean anything other than *physical* presence. *Gillpatrick* expressly did not decide the issue

since the lower state court's order could be reversed and vacated on procedural grounds. 297 Neb. at 883, 902 N.W.2d at 119. And the Plaintiffs find no support in the plain and ordinary meaning of "presence." Black's Law Dictionary 1302 (9th ed. 2009) ("presence" alternatively defined as "[t]he state or fact of being *in a particular place* and time" or "close *physical* proximity coupled with awareness" (emphasis added)).

The Plaintiffs devoted much energy during discovery to inquiring about the electronic conferencing and video capabilities in various NDCS facilities. None of that information is material to the issues before this Court since no videoconference marriage ceremony would be valid under Nebraska law.[2]

Likewise, to the extent the Plaintiffs now advance any argument that the Defendants should be compelled to transport either or both of them outside secure facilities for the purpose of marriage, the Defendants' denial is permissible under *Turner*. As a threshold matter, central to the Defendants' refusal to transport these Plaintiffs for a marriage are security concerns relating both to the transportation itself and the diversion of institutional resources to facilitate it. (Statement # 31(a).) "Security, of course, is a valid penological objective." *Herlein v. Higgins*, 172 F.3d 1089, 1090 (8th

---

[2] In the event the Court finds colorable the Plaintiffs' proposed definition of "presence" in Neb. Rev. Stat. § 42-109, the Court should order the parties to address whether the question should be certified to the Nebraska Supreme Court under NECivR 7.4. Although the Defendants do not believe this is necessary in light of the plain meaning of the statutory text, any such re-interpretation of the term should be conducted by that court as "the final arbiter of Nebraska law." *State ex rel. Rhiley v. Nebraska State Patrol*, 302 Neb. 241, 255, 917 N.W.2d 903, 913 (2018).

Cir. 1999) (citing *O'Lone*, 482 U.S. at 348). Subsumed within this goal is the Defendants' need to allocate scarce resources in an appropriate, security-oriented manner. (Statement # 31(c).)

With the legitimacy of the Defendants' penological objective established, it is the Plaintiffs' burden to *dis*prove the Defendants' articulation of the rational connection between that objection and the denial of the marriage requests here. *Overton*, 539 U.S. at 132.

The Defendants have provided this articulation based on their decades of experience running prisons and prison systems. The security concerns associated with transporting either Plaintiff for the purpose of attending a marriage ceremony include the increased risk and motivation for escape because both Plaintiffs are serving long prison sentences; the fact that the distance between the Plaintiffs would require transporting one Plaintiff through multiple jurisdictions; and the increased risk of escape when inmates are traveling at a time that is known in advance to the inmate. (Statement # 31(a).) Anytime an inmate is removed from a secure facility, the risk of escape is increased, and thus transportation enhances the risk to the public from a potential escapee. (*Id.*)[3] Reducing the occurrence of transporting inmates outside secure facilities except when absolutely necessary is thus directly connected to the overriding security objective.

---

[3] In Nebraska, specifically, this is hardly an abstract or theoretical concern. *See, e.g.*, Paul Hammel, *Two women, attacked by an escaped inmate in Lincoln, sue state*, Omaha World-Herald (Nov. 15, 2018), available at: https://www.omaha.com/news/courts/two-women-attacked-by-an-escaped-inmate-in-lincoln-sue/article_d16d6681-b6ee-50ce-85ad-bd0aefeab863.html; Lori Pilger, *Prison escapee Dixon gets 49-80 years more*, Lincoln Journal Star (Feb. 23, 2017), available at: https://journalstar.com/news/local/crime-and-courts/prison-escapee-dixon-gets---years-more/article_4fe48d00-3f64-5b7b-9ae8-8bbda6b8d33d.html.

Similar justifications have been recognized in other jurisdictions. *See, e.g.*, *Sandoval v. Obenland*, No. 3:17-CV-05667, 2019 WL 688876, at *4 (W.D. Wa. Jan. 19, 2019) (applying *Turner* factors to a prison policy restricting inmate marriage based in part on security-related transportation concerns). Closer to home, even where the Eighth Circuit has *invalidated* a restriction on inmate transportation for the exercise of a constitutional right, its reasoning has served to illustrate the validity of the Defendants' concerns. The Court of Appeals in *Roe v. Crawford*, 514 F.3d 789 (8th Cir. 2008), analyzed whether Missouri's policy against transporting female inmates for elective abortions could stand under *Turner*. The Court found little difficulty in finding the underlying transportation-related concerns were valid, accepting Missouri's contention that "*any* time an inmate is removed from prison, security is at risk." *Id.* at 795 (emphasis original). Missouri's argument was that by restricting transportation of inmates, it would reduce the occurrence of inmates outside secure facilities, thereby reducing the security risk. *See id.* But the problem with that argument, the Court explained, was that Missouri's policy—aimed though it was at advancing the legitimate penological goal of keeping inmates in secure facilities except as necessary—would result in *increased* inmate transportation since care during pregnancy and delivery would require more external medical referrals. *Id.* Missouri's justification was therefore undermined on the first *Turner* factor.

The lesson from *Crawford* is that penological concerns regarding the transportation of inmates—and, necessarily, the diversion of prison resources to facilitate such transportation—are legitimate. Missouri's failure was that it could not show a

"rational connection" between its policy and that legitimate goal, much less explain how the former furthered the latter. *See Turner*, 482 U.S. at 89. Here, the denial of the Plaintiffs' marriage requests suffers from no such logical gap. Declining to transport the Plaintiffs outside their secure facilities for a wedding ceremony will not result in their being transported for other reasons. The denial thus furthers the incontrovertibly legitimate goal of maintaining inmates—particularly ones like the Plaintiffs serving lengthy or life sentences for violent crimes—in secure facilities to the maximum extent possible.

For these reasons, the Court's analysis of the first *Turner* factor should favor the Defendants. Although the Defendants have addressed both the Plaintiffs' stated preferred remedy of a ceremony by video conference *and* the sole conceivable transportation alternative, the Defendants necessarily reserve the right to address this further in their cross-motion opposition in the event the Plaintiffs shift their focus to transportation.

## 2. There are no alternative means of exercising the marriage right.

The second *Turner* factor for determining the reasonableness of a prison restriction is "whether there are alternative means of exercising the right that remain open to prison inmates." 482 U.S. at 90. Where such alternatives are available for the exercise of the asserted right, "courts should be particularly conscious of the measure of the measure of judicial deference owed to corrections officials in gauging the validity of the regulation." *Id.* (internal quotation omitted).

Simply put, there are no alternative means for the Plaintiffs to marry. A ceremony by videoconference is not legally possible for the reasons discussed in the previous section. And the Plaintiffs' respective sentence structures and security needs render them ineligible for a custody or classification change (*e.g.*, a furlough) that would enable one of them to travel without escort to the other's facility. Thus, the Defendants concede that, at best, this factor is neutral to their position or favors the Plaintiffs. *See Sandoval*, 2019 WL 688876, at *4.

### 3. Accommodating the marriage request would impact guards, other inmates, and allocation of scarce prison resources.

The third *Turner* factor measures the impact of the accommodation of the asserted constitutional right on guards and other inmates, and on the allocation of prison resources generally. 482 U.S. at 90. "In the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order." *Id.* "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Id.*

Once again, this factor must be examined in two ways based on the possible remedies sought by the Plaintiffs. To the extent their proposed remedy is a videoconference ceremony, analyzing the institutional impacts is not even necessary since the ceremony would be per se legally invalid at the outset.

To the extent transportation of either Plaintiff is now proposed, the uncontroverted record shows there would be significant impacts. For purposes of this brief,

the diversion of institutional resources alone weighs against discretionary transportation. As Chief of Operations Sabatka-Rine stated, transporting either Plaintiff to a different facility would require a minimum of two staff. (Statement # 31(d).) A law enforcement chase vehicle would also potentially be required. (*Id.*) Because staff would be out of the facility transporting the Plaintiffs, other staff may have to work overtime, or have a day off cancelled to cover the transporting staffs' duties.(*Id.*; *see also Sandoval*, 2019 WL 688876, at *4 (finding third *Turner* factor weighed in prison officials' favor where marriage allowance—and the variety of administrative steps necessary to facilitate it—would "have a significant impact on both prison officials and the prison itself if officials were required to transfer prisoners between facilities for . . . marriage ceremonies.").)

This places the third *Turner* factor comfortably in the Defendants' favor. To the extent the Plaintiffs make new or additional arguments regarding transportation as a remedy, the Defendants will address such arguments in their opposition brief.

### 4. There are no ready alternatives to denying the marriage requests.

"Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Turner*, 482 U.S. at 90. "By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an "exaggerated response" to prison concerns." *Id.* "This is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Id.* at 90-91.

But the Defendants would not need to embark on such an exercise, anyway, for there are so few "conceivable alternatives." Though the Plaintiffs may seek to dress a videoconference ceremony as an alternative, it cannot qualify as such for the straightforward legal reasons discussed elsewhere in this brief. To the extent the Plaintiffs urge such a remedy as a viable accommodation at merely a "*de minimis* cost to valid penological interests," *Turner*, 482 U.S. at 91, they ask this Court to judicially re-write "presence" out of Nebraska's marriage statutes. The Court should decline this request.

## CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment should be granted.

Submitted March 21, 2019.

> **SCOTT FRAKES,**
> **ANGELA FOLTS-OBERLE,**
> **and MICHELE CAPPS,**
> **Defendants (in their official capacities)**
>
> DOUGLAS J. PETERSON, NE #18146
> Attorney General of Nebraska
>
> *s/David A. Lopez*
> DAVID A. LOPEZ, NE #24947
> Deputy Solicitor General
>
> RYAN S. POST, NE #24714
> BEN GOINS, NE #26034
> Assistant Attorneys General
>
> OFFICE OF THE ATTORNEY GENERAL
> 2115 State Capitol
> Lincoln, Nebraska 68509
> (402) 471-2682

dave.lopez@nebraska.gov
ryan.post@nebraska.gov

COUNSEL FOR THE DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2019, I electronically filed the foregoing document with the Clerk of the United States District Court for the District of Nebraska, using the CM/ECF system, causing notice of such filing to be served upon Plaintiffs' counsel of record.

By: *s/ David A. Lopez*