UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| PAUL GILLPATRICK, and NICCOLE WETHERELL, | ) ) ) | CASE NO.  4:18-cv-03011 |
| Plaintiffs, | ) ) | |
| vs. | ) ) ) | PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT |
| SCOTT FRAKES, Director, ANGELA FOLTS-OBERLE, Acting Warden, MICHELE CAPPS, Warden, in their Official Capacities, | ) ) ) ) ) ) | |
| Defendants. | ) | |

INTRODUCTION

Paul Gillpatrick and Niccole Wetherell, persons committed to the custody of Nebraska correctional facilities, originally filed their § 1983 suit in state court seeking declaratory and injunctive relief after Nebraska prison authorities withheld permission for them to marry. State Defendants removed the suit to federal court and this Court declined to remand the case to state court.[1] State court discovery was completed and now federal discovery has been completed. Gillpatrick and

---

[1] Gillpatrick and Wetherell have not abandoned their position concerning remand after removal. They suggest that this Court should revisit the removal/remand disagreement and to change course by abstaining and remanding the case to the state court. Nevertheless, this Court has ruled on that issue so Gillpatrick and Wetherell are proceeding in this Court to seek the relief to which they believe they are entitled.

1

Wetherell are moving for summary judgment and submit this brief in support of that motion. There is no genuine issue of material fact.

## STATEMENT OF UNDISPUTED FACTS

Under the local rule (Nebraska Civil Rule 56.1(a)), a party seeking summary judgment "must include in the brief in support of the summary judgment motion a separate statement of material facts about which the moving party contends there is no genuine issue to be tried and that entitles the moving party to judgment as a matter of law." Accordingly, Gillpatrick and Wetherell submit the following proposed statement of undisputed facts:

### Plaintiffs Are Eligible To Marry

1. Plaintiff Niccole Wetherell is currently in the custody of the Nebraska Department of Correctional Services (NDCS). Filing 1, Exhibit 1 (Complaint), ¶ 1, Filing 52-2 (Wetherell declaration), ¶ 3.

2. She is housed at the Nebraska Correctional Center for Women (NCCW). Filing 52-2 (Wetherell declaration), ¶ 3.

3. She is an unmarried woman over the age of eighteen. Filing 52-2 (Wetherell declaration) ¶ 4.

4. She is engaged and seeks to marry Paul Gillpatrick. Filing 52-2 (Wetherell declaration), ¶5.

2

5. Plaintiff Paul Gillpatrick is currently in the custody of the NDCS. Filing 1, Exhibit 1 (Complaint), ¶ 1, Filing 52-4 (Gillpatrick declaration), ¶ 3.

6. He is currently housed at the Nebraska State Penitentiary (NSP). Filing 52-4 (Gillpatrick declaration), ¶ 3.

7. He is an unmarried man over the age of eighteen. Filing 52-4 (Gillpatrick declaration), ¶ 4.

8. Paul Gillpatrick is engaged to marry Niccole Wetherell. Filing 52-4 (Gillpatrick declaration), ¶ 5.

9. Paul Gillpatrick and Niccole Wetherell are not related. Filing 1, Exhibit 1 (Complaint), ¶ 8, Filing 52-2 (Wetherell declaration), ¶ 7; Filing 52-4 (Gillpatrick declaration), ¶ 7.

10. Paul Gillpatrick and Niccole Wetherell are not housed in the same correctional facility. Filing 52-2 (Wetherell declaration), ¶ 8, Filing 52-4 (Gillpatrick declaration), ¶ 8.

11. Paul Gillpatrick is serving a sentence of 55-90 years with a projected release date of 2058. Niccole Wetherell is serving a sentence of life, with no projected release date.[2]

12. Defendant Scott Frakes is Director of the Nebraska Department of

---

[2] Nebraska Department of Correctional Services Inmate Locator, accessed March 14, 2019.

3

Correctional Services. Filing 1, Exhibit 1 (Complaint), ¶ 2.

13. Defendant Angela Folts-Oberle is Acting Warden of the Nebraska Correctional Center for Women. Filing 44 (Motion to Substitute Party).

14. Defendant Michele Capps is Warden of the Nebraska State Penitentiary. Filing 40 (Motion to Substitute Party).

## Plaintiffs Have Exhausted Their Administrative Remedies

15. Niccole Wetherell submitted a Marriage Intention Form through proper administrative channels at the NCCW. Filing 52-2 (Wetherell declaration), ¶ 9.

16. On May 15, 2012, Niccole Wetherell submitted an "inmate Interview Request. The reply was that "York County will not record a telephone wedding ceremony as a valid marriage. Both parties need to be present." Filing 52-1 (Wetherell grievances), Filing 52-2 (Wetherell declaration), ¶ 10.

17. Niccole Wetherell initiated the informal grievance process on July 2, 2012. Filing 52-1 (Wetherell grievances), Filing 52-2 (Wetherell declaration), ¶11.

18. On July 31, 2012, Niccole Wetherell's grievance was rejected. Filing 52-1 (Wetherell grievances), Filing 52-2 (Wetherell declaration), ¶11.

19. Ms. Wetherell timely filed a Step One Grievance on August 12, 2012. Filing 52-1 (Wetherell grievances), Filing 52-2 (Wetherell declaration), ¶11.

20. The grievance was denied in an undated typewritten response: "The NDCS does not transport inmates for the purpose of marriage, and support the

4

Informal Response." Filing 52-1 (Wetherell grievances), Filing 52-2 (Wetherell declaration), ¶11.

21. Ms. Wetherell completed the grievance process by submitting the Grievance Form, Step Two in a timely manner on September 9, 2012, per NDCS rules. Filing 52-1 (Wetherell grievances), Filing 52-2 (Wetherell declaration), ¶12.

22. The Step Two grievance was denied by Director Hopkins on September 14, 2012. Filing 52-1 (Wetherell grievances), Filing 52-2 (Wetherell declaration), ¶12.

23. Director Hopkins, on September 14, 2013, provided a response and reasons for decision reached in the Wetherell step two grievance: "You are grieving that the Department will not transport you and your fiancé to a courthouse to be married. The Department does not provide transportation for this purpose." Filing 52-1 (Wetherell grievances), Filing 52-2 (Wetherell declaration), ¶13.

24. Ms. Wetherell has exhausted available institutional procedures in trying to obtain permission to marry. Filing 52-1 (Wetherell grievances), Filing 52-2 (Wetherell declaration), ¶14.

25. Ms. Wetherell remains committed to the relationship and continues to wish to marry Paul Gillpatrick. Filing 52-2 (Wetherell declaration), ¶ 15.

26. Paul Gillpatrick submitted a Marriage Intention Form through proper administrative channels at the NSP. Filing 52-4 (Gillpatrick declaration), ¶ 9.

5

27. The Marriage Intention Form submitted by Mr. Gillpatrick was not approved. Filing 52-4 (Gillpatrick declaration), ¶ 9.

28. On July 16, 2013, Mr. Gillpatrick initiated the grievance process at the NSP complaining that "I would like to marry my fiancée Niccole Wetherell #94369, who resides in York Penitentiary For Women." Filing 52-3 (Gillpatrick grievances), Filing 52-4 (Gillpatrick declaration), ¶ 10.

29. Mr. Gillpatrick completed the grievance process, having submitted Grievance forms Step One and Step Two per NDCS rules. Filing 52-3 (Gillpatrick grievances), Filing 52-4 (Gillpatrick declaration), ¶ 11.

30. Mr. Gillpatrick received responses to each of his grievances and to his appeals. Filing 52-3 (Gillpatrick grievances), Filing 52-4 (Gillpatrick declaration), ¶ 11.

31. Mr. Gillpatrick's Step Two grievance was denied by the Director of the NDCS. Filing 52-3 (Gillpatrick grievances), Filing 52-4 (Gillpatrick declaration), ¶ 11.

32. Former DCS Director Hopkins, on September 4, 2013, provided a response and reasons for the decision reached: "You state you want to marry an inmate at the Nebraska Correctional Center for Women. As stated in the response to the Informal Grievance, the Department will not transport an inmate assigned to a secure facility to another secure facility to get married." Filing 52-3 (Gillpatrick

grievances), Filing 52-4 (Gillpatrick declaration), ¶ 12.

33. Diane Sabatka-Rine, while warden of NSP, testified "The marriage intention form itself is not approved or denied; it's simply processed upon completion. And in this case, because the individual that Mr. Gillpatrick was requesting to marry was not able to come into the penitentiary, the form ceased being processed." Filing 52-10 (Sabatka-Rine deposition 2015) at 25:1-4.

34. Mr. Gillpatrick has exhausted available institutional procedures in trying to obtain permission to marry. Filing 52-3 (Gillpatrick grievances), Filing 52-4 (Gillpatrick declaration), ¶ 13.

<u>The Marriage Poses No Threat of Disruption</u>

35. Ms. Wetherell has discussed her proposed marriage with a number of prisoners housed with her at NCCW. Filing 52-2 (Wetherell declaration), ¶ 16.

36. Not one prisoner has expressed any interest in disrupting her relationship with Paul Gillpatrick. Filing 52-2 (Wetherell declaration), ¶ 16.

37. No prisoner, who is aware of her desire to marry Paul Gillpatrick, has expressed, in any fashion, any intention to be disruptive of institutional security or good order because of this proposed marriage. Filing 52-2 (Wetherell declaration), ¶ 16.

38. She would be satisfied if her marriage ceremony were conducted electronically, by video conferencing or using a skype-like technology. Filing 52-2

(Wetherell declaration), ¶ 17.

39. If there are incidental expenses associated with an e-wedding ceremony, she is willing to reimburse the NDCS for such expenses. Filing 52-2 (Wetherell declaration), ¶ 18.

40. She and Paul Gillpatrick have a valid marriage license. Filing 52-7 (marriage license).

41. Pastor Craig Bock is licensed to solemnize marriages in Nebraska. Filing 52-8 (Pastor Craig Bock affidavit), ¶ 6.

42. Pastor Bock has agreed to preside over and to help Paul Gillpatrick and Niccole Wetherell solemnize and celebrate their marriage. Filing 52-8 (Pastor Craig Bock affidavit), ¶ 9.

43. Mr. Gillpatrick remains committed to the relationship and continues to wish to marry Niccole Wetherell. Filing 52-4 (Gillpatrick declaration), ¶ 14.

44. Mr. Gillpatrick has discussed this proposed marriage with a number of prisoners housed with him at NSP. Filing 52-4 (Gillpatrick declaration), ¶ 15.

45. Not one has expressed any interest in disrupting the relationship with Niccole. (Gillpatrick declaration), ¶ 15.

46. Not one has expressed, in any fashion, any intention to be disruptive of institutional security or good order because of this proposed marriage. (Gillpatrick declaration), ¶ 15.

47. Mr. Gillpatrick would be completely satisfied if his marriage ceremony were conducted electronically, by video conferencing or using a Skype-like technology. (Gillpatrick declaration), ¶ 16.

48. If there are incidental expenses associated with an e-wedding ceremony, Mr. Gillpatrick is willing to reimburse the NDCS for such expenses. (Gillpatrick declaration), ¶ 17.

<u>Defendants' Rationale for Denying the Marriage</u>

49. Administrative Regulation 208.01 (II)(D)(3)(a) was in effect when Wetherell and Gillpatrick originally filed their marriage intention forms and unsuccessfully pursued their administrative remedies. Filing 52-14 (NDCS regulation 208.01), Filing 52-11 (Sabatka-Rine deposition 2019) at 35:18 - 36:4.

50. Defendant Director Frakes' sole basis for denying Plaintiffs' request to marry is "As I understand the law, people must be physically present to be married." Filing 52-9 (Frakes deposition) at 74:11-12.

51. The process by which people in the custody of NDCS get married includes vetting people to be allowed into a facility and then having them screened before allowing them to enter, which has not created threats to the safety of the institution nor to the good order of the institution or to public safety. Filing 52-9 (Frakes deposition) at 57:9-19.

52. Director Frakes could not recall any problem arising during a wedding.

Filing 52-9 (Frakes deposition) at 57:20-23.

53. The current warden at NSP, Michele Capps testified that there was no reason to deny the marriage other than security risks associated with moving the prisoners. Filing 52-13 (Capps deposition) at 30:5-13.

54. Former NCCW Warden Denise Davidson testified that there "should not be a problem" for Wetherell to marry. Filing 52-12 (Davidson deposition) at 24:12-23. Ms. Davidson has been replaced with acting warden Angela Folts-Oberle. Filing No. 45 (Order substituting party).

55. There are no alternative means by which Gillpatrick and Wetherell can be married. Filing 52-10 (Sabatka-Rine deposition 2015) at 45: 4-14.

56. Director Frakes testified normally there is not a cost associated with allowing weddings in the facility. Filing 52-9 (Frakes deposition) at 52:9 to 53:3, 53:4-21.

57. Moving a confined person within the facility does not involve any additional staff commitment beyond visitation staff. Filing 52-9 (Frakes deposition) at 53:22 to 54:6; Filing 52-13 (Capps deposition) at 39:6-10.

<u>Defendants Possess the Necessary Technology</u>

58. NSP has video conferencing technology which is used for court appearances and telepsych services. Filing 52-10 (Sabatka-Rine deposition 2015) at 29:15-25; 32:13-21; 33:9-10; 33:13-21; 34:12-19; Filing 52-11 (Sabatka-Rine

10

deposition 2019) at 50:19 - 51:9; 34:20 - 35:4; Filing 52-13 (Capps deposition) at
22:9-20.

59. NSP has participated in a program to allow selected people in their
custody to participate in parent-teacher conferences on a remote basis. Filing 52-13
(Capps deposition) at 23:21-24; Filing 52-10 (Sabatka-Rine deposition 2015) at
32:13-21; Filing 52-11 (Sabatka-Rine deposition 2019) at 53:22-25.

60. NCCW has video conferencing. Filing 52-12 (Davidson deposition) at
12:6-12.

61. Defendants permit telepsych mental health services to occur using a
video conferencing system, although it may not be the same one as is used to work
with the courts. Filing 52-11 (Sabatka-Rine deposition 2019) at 54:1-11; Filing 52-
12 (Davidson deposition) at 13:12-16, Filing 52-9 (Frakes deposition) at 65:25.

62. Director Frakes confirmed that NDCS has and uses video conferencing
technology. Filing 52-9 (Frakes deposition) at 60:18-25.

Defendants' Regulations

63. Gillpatrick and Wetherell filed suit in 2014 in Lancaster County, Nebraska
District Court. *Gillpatrick and Wetherell v. Nebraska Department of Corrections,
et al.,* Case CI 14-669. Filing 52-6 (Order granting Plaintiffs' motion for summary
judgment).

64. A decision in that case in favor of Gillpatrick and Wetherell was reversed

on appeal on procedural grounds. *Gillpatrick v. Sabatka-Rine*, 297 Neb. 880, 902 N.W.2d 115 (2017)

65. Gillpatrick and Wetherell's applications for permission to marry were filed while the original regulation was in force. Filing 52-11 (Sabatka-Rine deposition 2019) at 35:18 - 36:4.

66. Until June 30, 2016, prisoner marriages were processed under AR § 208.01(D)(3). Filing 52-14 (NDCS regulation 208.01).

67. AR 205.04(1)(D) replaced AR 208.01(3) on June 30, 2016. Filing 52-15 (NDCS Policy 205.04).

68. Defendant Frakes has never granted permission to two prisoners to marry under AR 205.04(1(D). Filing 52-11 (Sabatka-Rine deposition 2019) at 42:19-23.

## ARGUMENT

## I.     Plaintiffs Have a Constitutional Right to Marry

Gillpatrick and Wetherell's claim begins with the unremarkable assertion that they have a right to marry guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Loving v. Virginia*, 388 U.S. 1 (1967); *Turner v. Safley*, 482 U.S. 78 (1987); *Zablocki v. Redhail*, 434 U.S. 374 (1978); *United States v. Windsor*, 570 U.S. 744 (2013); *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015). This right survives a commitment to prison per *Turner*. In

the state court proceedings[3], prior to removal, the trial court found both parties

agreed that "there is a fundamental and constitutional right of inmates to marry."

Filing 52-6 (Order granting Plaintiffs' motion for summary judgment) at page 1.

Gillpatrick and Wetherell are asking for an e-wedding. They wish to use

video conferencing technology already in place that is used for court appearances

or for telepsychiatry appointments.[4] Alternately, they are asking to use the existing

regulation which allows some prisoners to remotely participate in parent teacher

conferences by bringing into each facility a prior approved laptop which will use

institutional wi-fi connections to have a wedding ceremony. Neither proposal

would adversely impact any legitimate penological interest. Gillpatrick and

Wetherell have no other alternative means by which to marry. Neither proposal

would have any measurable impact on prison staff, facilities, or resources. Both

---

[3] In *Gillpatrick and Wetherell v. Nebraska Department of Corrections, et al.,* Case CI 14-669, Filing 52-6, Lancaster County, Nebraska District Judge Robert Otte analyzed the *Turner* factors. He found that Gillpatrick and Wetherell had established that each factor weighed in plaintiffs' favor. The state court granted injunctive relief. That decision, however, was reversed on appeal on the procedural ground that these same defendants or their predecessors in office had not been sued in their official capacity and so could not be enjoined. *Gillpatrick v. Sabatka-Rine,* 297 Neb. 880, 902 N.W.2d 115 (2017). Thus, the state trial court decision, while informative and persuasive, is not res judicata.

[4] Telepsychiatry is mental health counseling that permits a remote psychiatrist to consult with a patient and prescribe medication from a distance, usually through videoconferencing. It is authorized under Neb. Rev. Stat. § 71-8503 et seq and is currently used by NDCS to prescribe psychotropic medications to prisoners in custody.

proposals would fully accommodate Plaintiffs' constitutional rights at no cost to the Defendants and without inconvenience to their staff, facilities or resources.

## A. *TURNER* FACTORS

*Turner* supplied a four-part test to balance the prisoners' exercise of their constitutional right with "legitimate penological" interests associated with running a state prison[5]: (1) Whether there is a rational connection between the state regulation and a legitimate penological interest? (2) Whether there is a reasonable alternative means by which plaintiffs may exercise their constitutional rights? (3) Would allowing an e-wedding cause an adverse impact on prison staff, facilities, or resources? (4) Are there alternatives for achieving legitimate penological interests while fully accommodating plaintiffs' rights at *de minimis* cost? Plaintiffs prevail on each factor.

### 1.  Rational Connection between Regulation and a Legitimate Penological Interest

The first *Turner* factor asks whether there is a valid, rational connection between the policy which effectively prohibits weddings between prisoners housed

---

[5] These elements mirror and consequently satisfy the PLRA requirements for granting "prospective relief." PLRA, 18 U.S.C. § 3626(a)(1)(A). A court cannot grant relief "unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." In short hand, "least intrusive" means no or *de minimus* impact on the institution, staff or resources; "narrow" means ordering only these officials to provide relief only to these plaintiffs.

in different facilities and a legitimate penological interest? When Plaintiffs

initiated their marriage request in 2012, the criterion was set out in Administrative

Regulation 208.01 (II)(D)(3)(a). Filing 52-14 (NDCS policy 208.01) at page 5.

That regulation provided "Inmates in the Department's custody will be allowed to

marry unless the Warden finds that the marriage presents a threat to security or

order of the institution or to public safety." Gillpatrick and Wetherell have offered

substantial evidence that an e-wedding between Paul Gillpatrick and Niccole

Wetherell would pose no threat whatsoever to security or order of either institution.

The record contains uncontroverted evidence that an e-wedding between Paul

Gillpatrick and Niccole Wetherell would pose no threat whatsoever to public

safety. Applying this standard, Gillpatrick and Wetherell have proven that AR

208.01 (II)(D)(3)(a) does not justify the denial of an e-wedding.

When asked for the basis upon which Gillpatrick's request to marry

Wetherell was denied, Director Frakes testified, "As I understand the law, people

must be physically present to be married." Filing 52-9 (Frakes deposition) at

74:11-12.[6] His further explanation of the basis upon which Gillpatrick's marriage

---

[6] Gillpatrick and Wetherell vigorously dispute this interpretation of Neb. Rev. Stat. § 42-109. The refutation of Frakes' statutory argument is developed later in this brief. And his 'no transportation' assertion is a red herring considering that Gillpatrick and Wetherell are not asking to be transported. Sabatka-Rine was informed that Gillpatrick and Wetherell were not asking for transportation prior to 2015. Filing 52-10 (Sabatka-Rine deposition 2015) at 43:9-11.

15

intention form was denied was, "In my memory, though, again, the – the specific denial was based on his location, not being allowed to be transported to another facility." Filing 52-9 (Frakes deposition) at 82:11-14. This was the only basis he could recall. Filing 52-9 (Frakes deposition) at 82:15-20. Director Frakes was asked whether any other factor would cause the Plaintiffs' marriage to be denied, and he replied, "I'm not aware of any." Filing 52-9 (Frakes deposition) at 87:3-14 and 86:22-25.

Some people in the custody of NDCS do get married. The process involves vetting people to be on the visitor list for a person in custody. Before any visitor seeking to visit is allowed into a facility, they have to be on an approved visiting list. Once they arrive for the visit, their person is subject to search. Director Frakes testified the screening process used for admitting participants in a marriage ceremony into a facility is sufficient and does not creat threats to the safety of the institution nor to the good order of the institution or to public safety. Filing 52-9 (Frakes deposition) at 57:9-19. Director Frakes could not recall any problem arising during a wedding. Filing 52-9 (Frakes deposition) at 57:20-23.

Director Frakes does not assert a "threat to security or order of the institution or to public safety" would exist in an e-wedding. He has adopted an untenable interpretation of a state statute as requiring physical presence of both celebrants during the exchange of wedding vows; after which he employs a policy against

transporting people in his custody from their assigned facility to another facility for
marriage purposes. He has erected a Catch-22 where Gillpatrick and Wetherell
cannot marry unless they are in the same place for the exchange of vows and the
Department will not transport either of the plaintiffs to the facility holding the
other. His conclusion results in a situation where the marriage is absolutely
prohibited, particularly for these Plaintiffs given their sentences: they will never be
eligible to marry under the Defendants' policy. Gillpatrick and Wetherell
respectfully reject this syllogism and the Director's ultimate conclusion.

Diane Sabatka-Rine was warden of the Nebraska State Penitentiary from
September, 2011 to April, 2015. She was advised of Gillpatrick's request to marry
when he filed his grievance. Filing 52-10 (Sabatka-Rine deposition 2015) at 6:1-
11. "The marriage intention form itself is not approved or denied; it's simply
processed upon completion. And in this case, because the individual that Mr.
Gillpatrick was requesting to marry was not able to come into the penitentiary, the
form ceased being processed." Filing 52-10 (Sabatka-Rine deposition 2015) at
25:1-4.

The current warden at the Nebraska State Penitentiary (NSP) Michele Capps
testified there was no reason to deny the Plaintiffs' marriage except a security risk
if they were seeking to be transported to be together. Filing 52-13 (Capps
deposition) at 30:5-13. Former NCCW Warden Denise Davidson testified that

17

there "should not be a problem" for Wetherell to marry. Filing 52-12 (Davidson deposition) at 24:12-23.

AR 208.01 (II)(D)(3)(a), Filing 52-14, is the administrative regulation applicable at the time Gillpatrick and Wetherell began asking for permission to marry. That regulation provided that "Inmates in the Department's custody will be allowed to marry unless the Warden finds that the marriage presents a threat to security or order of the institution or to public safety." None of the wardens, then or since, can point to any reason related to threats to security or good order or to public safety to reject this proposed wedding.[7] There is no valid penological interest which supports denial of a wedding between Gillpatrick and Wetherell. The first *Turner* factor weighs strongly in favor of Plaintiffs' motion for summary judgment.

### 2. No Reasonable Alternative Means Exists by Which Plaintiffs May Exercise Their Constitutional Rights

---

[7] In 2015, NDCS revoked AR 208.01 (II)(D)(3). There is no direct evidence that this repeal was done for the purpose of affecting this litigation, which was filed in 2014. Director Frakes could not recall if this pending litigation was discussed as part of the development of the newer policy. Filing 52-9 (Frakes deposition) at 27:10. When Director Frakes was asked if he recalled why the regulation was changed, he said, "Well, the honest, direct answer is no. I don't recall." Filing 52-9 (Frakes deposition) at 26:2-3; and "And, again, I don't recall the conversation specifically that led to that." Filing 52-9 (Frakes deposition) at 31:23-24. A different regulation, AR 205.04(1)(D), was adopted in 2016. Filing 52-15 (NDCS Policy 205.04) Its retroactive applicability is addressed *infra*.

The second *Turner* factor also weighs heavily in favor of Gillpatrick and Wetherell.  Defendants admit that there are no alternative means by which Gillpatrick and Wetherell can be married. Filing 52-10 (Sabatka-Rine deposition 2015) at 45: 4-14. She was asked if her "interpretation of the Administrative Regulation is that the only marriage that would be authorized by the Department of – by, by the penitentiary or by the Department of Corrections would be one that was officiated with both celebrants, the witnesses and the official all in the same place at the same time, is that right?" Her response was unambiguous. "Correct. There's no other process that would allow all of those individuals to communicate any other way, unless they were all physically present in the same location." And when asked if "that interpretation is the official policy of the Nebraska Department of Correctional Services, that, whether there is or is not an alternative mechanism, the Department of Corrections will not permit a marriage ceremony to go forward unless everyone's in the same room?" Warden Sabatka-Rine answered, "That's my understanding, yes." Filing 52-10 (Sabatka-Rine deposition 2015) at 45:21-25.

Warden Capps concurred. "Q. Can you please tell us if you can think of any way, any legitimate way, that Mr. Gillpatrick could marry the person that he is asking to marry?" . . . "A. Not a secure way, no. That I would feel comfortable approving transport of either person. Q. And I take it in your answer is the (sic) if they're not in the same room, it doesn't – it's not a marriage, as far as your view of

19

things? A. Correct. Q. So that would mean, then, that Mr. Gillpatrick cannot, assuming that they both have essentially very long sentences, ever marry the person he wants to marry? A. Correct." Filing 52-13 (Capps deposition) at 29: 1-19.

Warden Davidson agreed. "Q. Okay. Ma'am, can you tell me whether you can think of any procedure by which Nicole (sic) Weatherell, (sic) while still in your custody, can marry Paul Gillpatrick while he is still in custody of the Nebraska State Penitentiary? A. Any procedure? Q. Yes, ma'am. A. No." Filing 52-12 (Davidson deposition) at 34:14-21; 34:14-21.

### 3. No Adverse Impact on Prison Staff, Facilities or Resources

Gillpatrick and Wetherell have established that granting an e-wedding by granting access to institutional video conferencing technology or permitting laptops to temporarily enter both facilities would have no or at most *de minimus* impact on prison facilities, staff and resources.

Director Frakes addressed the reality that admitting civilians, such as a prospective spouse, a magistrate or minister and up to two witnesses would not impose additional costs unless the person in custody asked for a special setting. Asked if "permitting those people to enter for purposes of a marriage ceremony" results in "additional costs chargeable to the department or to the facility associated with" a marriage, He explained, "Normally, no. . . . But if we're able to

20

work with the couple – couple schedule in times when we have staff that are available dedicated to these types of – not specifically marriage, but, you know, processing people into the facility, being present during the marriage, then normally not a cost associated." Filing 52-9 (Frakes deposition) at 52:9 to 53:3.

Moving the person committed to NDCS within a facility is normally done using a pass system, which "would not result in any additional cost to the facility? A. That's true." Filing 52-9 (Frakes deposition) at 53:4-21. Moving a confined person does not involve any additional staff commitment beyond visitation staff already assigned to the post of the visiting room. Filing 52-9 (Frakes deposition) at 53:22 to 54:6. Assuming the wedding is scheduled "when visiting staff are actually there, so they supervise it, but it's outside normal visiting times during the week." Filing 52-13 (Capps deposition) at 38:20-23. Consequently, "There would be no additional cost." Filing 52-13 (Capps deposition) at 39:6-10.

An e-wedding further reduces any small remaining threat to security or order or public safety resulting from those risks associated with a traditional wedding. In an e-wedding, the witnesses do not have to enter either facility. Both Gillpatrick and Wetherell would receive a pass to move within their respective institutions to the space set aside by the institution for the ceremony. One vetted and approved visitor would enter each facility with an internet-capable laptop with video conferencing (Skype-like) software. That laptop would access the wi-fi system of

21

the institution. Alternately, the parties need not bring laptops into the facility at all if Plaintiffs are permitted to marry using the video conferencing equipment already in place for court hearings and telepsychiatry.

The minister, the witnesses and Gillpatrick and Wetherell would, under regular supervision of the institution, and using the same protocol as is used for court hearings and telepsychiatry or using the same protocol as is used for parent teacher conferences, exchange their solemn vows electronically. Sometime thereafter, the minister would visit each party and have them each sign the marriage license. Pastor Bock knows Niccole Wetherell and is willing to conduct the marriage in this manner. Filing 52-8 (Pastor Craig Bock affidavit) at page 4.

These Defendants already permit other similar activities with no adverse impact on prison resources. The NSP has video conferencing technology which is used for court appearances and telepsych services. Filing 52-10 (Sabatka-Rine deposition 2015) at 29:15-25; 32:13-21; 33:9-10; 33:13-21; and 34:12-19; Filing 52-11 (Sabatka-Rine deposition 2019) at 50:19 to 51:9; 34:20 to 35:4; Filing 52-13 Capps deposition) at 22:9-20. NSP has a program to allow selected people in their custody to participate in parent-teacher conferences on a remote basis. Filing 52-13 Capps deposition) at 23:21-24; Filing 52-10 (Sabatka-Rine deposition 2015) at 32:13-21; Filing 52-11 (Sabatka-Rine deposition 2019) at 53:22-25. NCCW also has video conferencing. Filing 52-12 (Davidson deposition) at 12:6-12. They

22

permit telepsych mental health services to occur using a video conferencing system, although it may not be the same one as is used to work with the courts. Filing 52-11 (Sabatka-Rine deposition 2019) at 54:1-11; Filing 52-12 (Davidson deposition) at 13:12-16.

Director Frakes confirmed that NDCS owns and uses video conferencing technology for court hearings, telepsychiatry and telemedicine. Filing 52-9 (Frakes deposition) at 60:18-25, 65:11-12, 65:25.

The technology exists so that an e-wedding could occur. The evidence is that such a wedding would have virtually no cost to the Defendants or the NDCS, certainly less than the cost of a more traditional wedding. The evidence is that an e-wedding would involve less risk to the public and pose no risk to security or good order.

This *Turner* factor weighs strongly in favor of Gillpatrick and Wetherell.

### 4. Gillpatrick and Wetherell Have Offered Two Alternatives for Achieving Legitimate Penological Interests While Fully Accommodating Plaintiffs' Rights at *de minimis* Cost

Plaintiffs' evidence demonstrates the existence of two reasonable, no cost means by which they can be married. Wetherell and Gillpatrick have proposed to have an e-wedding. They have proposed to use the NDCS video conferencing equipment. Or they have proposed to use laptops brought into the facility by the minister and/or counsel for Gillpatrick and Wetherell and then use the institutional

23

wireless internet connection. These alternatives raise no safety, institutional order or public safety concerns whatsoever.

This factor weighs heavily in favor of Gillpatrick and Wetherell.

Gillpatrick and Wetherell have proven that there are no legitimate penological interests at play; that no alternative to allowing for an e-wedding exists and that an e-wedding would have no adverse impact on either institution, pertaining to security, good order, or public safety. Gillpatrick and Wetherell have tendered two reasonable alternatives which fully accommodate their constitutional rights while imposing no or at most *de minimus* costs on Defendants.

All four *Turner* factors weigh heavily in favor of Gillpatrick and Wetherell. Professor Eric Berger, in Individual Rights, Judicial Deference, and Administrative Law Norms in Constitutional Decision Making, 91 B.U.L. Rev. 2029 (2011) described why the Supreme Court in *Turner* upheld the prisoner to prisoner mail regulation and rejected the unlimited, unreviewable discretion given to the Warden in the Missouri marriage regulation:

> The Court explained its approach in part by observing that marriage is a fundamental right but opted not to resolve the case on those grounds. Instead, the Court concluded that the marriage regulation lacked 'common sense' and was 'not reasonably related to the penological interests cited by the prison. The *Turner* Court, in fact emphasized that the prison's assessment of danger was 'an exaggerated response to . . . security objectives.'") (footnotes omitted).

In this case, Defendants do not credibly assert a threat to security or order of the institution or to public safety as a basis to impede the Gillpatrick and Wetherell e-wedding in the first place. This case does not present an exaggerated response. There is simply no legitimate penological interest which supports preventing Niccole Wetherell and Paul Gillpatrick from having an e-wedding.

### 5. Cases Applying *Turner* in Prisoner Marriages Have Granted Permission to Marry

Since *Turner*, other prisoners have brought similar marriage claims with success over the last few decades:

*Salisbury v. List*, 501 F. Supp. 105 (D. Nev. 1980) is apparently an advisory opinion, "No injunctive relief will be granted at this time. It is assumed that the defendants will promptly amend the offending Procedure No. 314 in conformity with this Memorandum Decision and the aforementioned partial summary judgment.").

In *Langone v. Coughlin*, 712 F. Supp. 1061 (N.D.N.Y. 1989), Langone, a New York prisoner serving a term of fifteen years to life, sued the Commissioner of the New York Department of Corrections (NYDOC) seeking permission to marry. The trial court applied the four *Turner* factors and found that all four supported Langone.

Buehl was a prisoner awaiting execution who sought permission to marry in *Buehl v. Lehman*, 802 F. Supp. 1266 (E.D. Pa. 1992). His request was denied

25

because his intended spouse had attempted to smuggle marijuana into the prison six years before the marriage effort. The trial court denied a motion for summary judgment filed by the Commissioner of the Pennsylvania Department of Corrections because disputed, material facts were unresolved.

Vasquez, a life sentenced prisoner in New Jersey, sought permission to marry and was denied in *Vazquez v. N.J. Dep't of Corr.*, 791 A.2d 281 (N.J. Super. Ct. App. Div. 2002). Her appeal was successful since New Jersey corrections officials did not offer a valid penological justification to deny her application.

In *Martin v. Snyder*, 329 F.3d 919 (7th Cir. 2003), Martin, an Illinois prisoner, sought to marry. His fiancé was barred from visitation because of Martin's misconduct at an earlier visit. Once visitation was restored, they were married. Then they brought suit seeking damages for the unnecessary delay in allowing the marriage to go forward. Martin lost, appealed and lost again. However, he lost on qualified immunity grounds because no Supreme Court decision had previously determined that a delay in allowing a marriage ceremony warranted monetary damages.

*Miller v. Wenerowicz*, 648 F. App'x 161 (3d Cir. 2016), like *Martin*, is a delayed marriage damages case, instructive for our purposes as being yet another circuit repeating the basic rule that prisoners, even those doing long prison

sentences, are constitutionally entitled to marry absent legitimate penological

interests to the contrary.

During the state court phase of this litigation, Defendants lifted quotes out of

context from *Toms v. Taft*, 338 F.3d 519 (6th Cir. 2003). However, this case is

squarely in support of Gillpatrick and Wetherell. "Laura Toms and Ira Chaiffetz, a

prisoner, sought to marry, but were unable to obtain a marriage license because

Chaiffetz's incarceration made it impossible for him to comply with an Ohio statute

requiring both applicants for a marriage license to appear personally before the

probate court." *Id.* at 521. The request for injunctive relief was mooted in *Toms*,

when "With the district court's supervision, the parties reached a settlement with

respect to the claims for injunctive relief, and Toms and Chaiffetz married." *Id*. In

Ohio, both people intending to marry were required to appear before the probate

court in order to obtain a marriage license. Warden Brigano declined to appoint a

surrogate probate clerk, "stating in a letter, "I do not see myself or the institution

being involved in this process," other than allowing a brief marriage ceremony

during normal visiting hours if the couple obtained a marriage license." *Id. at*

522.Gillpatrick and Wetherell have legally obtained a marriage license, making

*Toms* a uniquely inapposite case for Defendants to rely upon.

The *Toms* court held "We affirm the finding of qualified immunity.

(Footnote omitted) However, in order to provide more guidance to officials in the

future, we note that *Turner's* test extends to situations in which a prisoner's right to marry will be completely frustrated without prison officials' affirmative assistance. **Although it was not previously clearly established, we now hold that the distinction between actively prohibiting an inmate's exercise of his right to marry and failing to assist is untenable in a case in which the inmate's right will be completely frustrated without officials' involvement.** Therefore, where an inmate will be unable to marry without prison officials' affirmative assistance, *Turner's* strictures apply. The inmate's right to marry may be curtailed only where the officials' refusal to assist the inmate is reasonably related to legitimate penological interests." *Id.* at 526-27 (emphasis supplied)

In *Aliviado v. Kimoto*, No. 12-00259 SOM-BMK, 2012 U.S. Dist. LEXIS 108118 (D. Haw. Aug. 1, 2012), Plaintiffs were non-prisoners attempting to marry Hawaii prisoners, who submitted applications to marry. Hawaii prison marriage policy allowed a warden to deny a marriage request if it "presents a threat to the security or the good government of the institution or to the protection of the public." Defendants prohibited one of the marriages because the non-prisoner was a formerly convicted felon, and thus claimed the marriage presented a security risk and a risk from the prisoner's association with her. The Court held that this reason was not rationally related to the security interest since the non-prisoner was already able to visit in person and talk on the phone; marriage would not provide them any

28

greater opportunities to associate or present any greater security risk. For the
second couple, the defendants prohibited that marriage because of the threat that
the prisoner, a convicted sexual offender, might pose to the non-prisoner's minor
son. The Court again held that the reason for denying their marriage was not
rationally related to the safety interest in protecting a minor. The prisoner was only
scheduled for release once the minor was an adult, and marriage would provide no
greater opportunities for interaction than co-habitation alone.  Neither denial
satisfied the first prong of *Turner* and the remaining factors favored the plaintiffs.
First, there were no alternative means of exercising their right to marry, since they
must receive permission from the prison. Next, the impact of allowing the marriage
on prison staff and resources was quite low. Lastly, there were possible alternatives
that defendants could implement.

*Zastrow v. Pollard,* No. 11-C-371, 2013 U.S. Dist. LEXIS 42439 (E.D. Wis.
Mar. 26, 2013) involved two prisoners wishing to marry. Several state defendants
were dismissed because they played no part in the marriage denial. The remaining
defendants claimed that Zastrow did not complete premarital counseling and that
his intended was also incarcerated in a different facility. Zastrow proposed that the
premarital counseling could be done via video conferencing. "But aside from a
vague mention of unspecified logistical or cost concerns, defendants do not explain
why Zastrow's request to participate in the required counseling by videoconference

is unacceptable. Although in-person counseling may be preferable, the requirement of in-person marriage counseling bars Zastrow from progressing towards marriage approval until Ms. Lewis is released from prison." *Id.*at *17

*Riker v. Lemmon,* 798 F.3d 546 (7th Cir. 2015) was a case of a former correctional employee who became involved with a prisoner, Vest. After the relationship was discovered, she quit her job with the prison. She later accepted Vest's proposal for marriage. Vest filed with the institution seeking permission for a wedding ceremony. When that was denied, Riker filed a federal suit seeking an injunction allowing her to marry Vest. The Seventh Circuit reversed a trial court rejection of Riker's marriage claim.

*Reed v. Kemper*, No. 15-CV-208-JPS, 2015 U.S. Dist. LEXIS 168898 (E.D. Wis. Dec. 17, 2015) involved a prisoner serving a life sentence without parole who was granted an injunction ordering prison officials to allow a prisoner marriage. Reed was granted summary judgment. None of the prison's purported justifications – Reed's criminal history, sentence structure, or unmet programming needs – were "rationally related" to the prison's legitimate interest in public safety. Regarding sentence structure, the court dismissed the warden's lack of confidence in plaintiff's ability to "provide care and support" for his fiancé despite being incarcerated for the rest of his life. The trial court emphasized the transcendent significance of marriage, with such factors as spiritual connection and receipt of

30

government benefits, as highlighted in *Turner*. As to the other three *Turner* factors, the court stated that there is no alternative method for plaintiff to exercise his right to marry without the warden's permission. The court also held that burden on the administration was slight. The injunction order was affirmed by the 7th Circuit. *Reed v. Kemper*, 673 F. App'x 533 (7th Cir. 2016)

These cases share some basic commonalities. Prisoners do not shed their constitutional rights at the prison gates. Marriage is a fundamental right which survives imprisonment. Institutional invocations of security and good order are not talismanic, but are susceptible to evidentiary rebuttal. Minor administrative inconveniences are not sufficient to permit corrections officials to erect an impenetrable barrier to the wedding aspirations of prisoners. Gillpatrick and Wetherell have provided evidence to support their assertion that no legitimate penological interest supports the denial of their request for an e-wedding. They have submitted evidence which satisfies all four *Turner* factors.

Gillpatrick and Wetherell ask this Court to order the Defendants to stop interfering with their right to marry. One alternative remedy to resolve this constitutional violation would be for the Defendants to permit Gillpatrick and Wetherell to have a video conference e-wedding using institutional video conferencing equipment. Another would be to permit Gillpatrick and Wetherell's attorneys to bring a laptop with internet connectivity into each facility so that the

minister and the witnesses could participate in the wedding ceremony electronically using the institution's internet connectivity.

## B. DEFENDANTS' READING OF THE NEBRASKA STATE MARRIAGE STATUTE IS INCORRECT

Defendants insist that they are not obligated to transport one prisoner to the facility of another prisoner for a wedding ceremony (seeking to rebut a claim not made by Gillpatrick or Wetherell) and that unless transportation happens, no marriage ceremony can occur because Gillpatrick and Wetherell will not be in the physical presence of each other when exchanging their solemn declarations. Defendants misinterpret the state statute, Neb. Rev. Stat. § 42-109,[8] in order to support their resistance to the marriage. Ambiguities in the state statute raise issues preliminarily of state law.

Neb. Rev. Stat. § 42-109 presents several issues which may narrow the potential conflict between Gillpatrick and Wetherell's constitutional right to marry and the refusal of Defendants to permit an e-wedding ceremony. These concerns are: (1) Whether the plain language of the statute directs that each spouse necessarily has to be in the physical presence of the prospective other spouse when

---

[8] "In the solemnization of marriage no particular form shall be required, except that the parties shall solemnly declare in the presence of the magistrate or minister and the attending witnesses, that they take each other as husband and wife; and in any case there shall be at least two witnesses, besides the minister or magistrate present at the ceremony."

making their solemn declarations? (2) Whether the statute is directory rather than mandatory? (3) Whether the meaning of "presence" has evolved so that electronic presence is sufficient? (4) Whether deference is due to an agency determination of the meaning of a statute which is not within its administrative mandate?

### 1. Plain Language about Physical Presence

A straightforward reading of the plain language of the statute establishes that Gillpatrick and Wetherell need not be in each other's physical presence for their declarations to be sufficient to form a valid marriage. Defendants essentially insert words into the statute seeking to force it to fit their desired result. They see "the parties shall solemnly <u>and simultaneously</u> declare in the <u>physical but not electronic</u> presence of the magistrate or minister, <u>the other party</u> and the attending witnesses, that they take each other as husband and wife." None of the underlined words appear in the statute now. None have ever been in the statute. The Defendants cannot cite to a single Nebraska appellate decision which inserts these words into the statute.

The actual words of the statute direct that the solemn declaration of the parties should take place "in the presence of the magistrate or minister and the attending witnesses." Grammatically, this list does not literally direct that the declarations must be made to each other. This is not "stifling literalness." *Associated Press v. United States*, 326 U.S. 1 (1945) (J. Frankfurter, concurring).

33

In most situations the bride and the groom would likely prefer to be in each other's actual physical presence when they wed. However, it is not the function of the executive branch to insert words or to otherwise revise a statute. It is also not within the judicial ambit to revise statutory language.

Defendants have previously looked to the provenance of Neb. Rev. Stat. § 42-109 for support. They have been disappointed. Neb. Rev. Stat. § 42-109 has not changed so much as a comma since its adoption when Nebraska was a territory in 1866. Moreover, history does not help Defendants. Nebraska recognized common law marriage from pre-statehood until 1923.[9] *Harrison v. Cargill Com. Co.*, 126 Neb. 185, 252 N.W. 899 (1934); *Collins v. Hoag & Rollins*, 122 Neb. 805, 241 N.W. 766 (1932), vacating *Collins v. Hoag & Rollins*, 121 Neb. 716, 238 N.W. 351 (1931); *Bowman v. Bowman*, 163 Neb. 336, 79 N.W.2d 554 (1956); *In re Estate of McCartney*, 213 Neb. 550, 330 N.W.2d 723 (1983). This short excursus into old Nebraska domestic relations law provides a context within which understanding the relevance of 1866 word choices might influence 2019 statutory interpretation.

---

[9] The change away from common law marriage did not result in any change to Neb. Rev. Stat. § 42-109. No Nebraska statute required then or requires now that the parties be physically present for the solemnization.

Early reported decisions upheld marriages in the absence of one of the parties,[10] in the absence of a minister or magistrate and in the absence of witnesses. That is, the law refused to invalidate marriages in the face of a failure to adhere to the directions provided by Neb. Rev. Stat. § 42-109.

Despite the actual words used in Neb. Rev. Stat. § 42-109, that solemn declarations are to be made "in the presence of the magistrate or minister and the attending witnesses," even a magistrate or minister is not indispensable to the solemnization of a marriage. In *Gibson v. Gibson*, 24 Neb. 394, 39 N.W. 450 (1888), the Nebraska Supreme Court determined the validity of an Illinois marriage under a statute[11] which required the presence of a magistrate or minister and witnesses. Maddie Gibson sued Vincent Gibson seeking a Nebraska judicial declaration that they were validly married in Illinois. The facts in *Gibson*: "It is in

---

[10] Adam Candeub and Mae Kuykendall, Modernizing Marriage, 44 U. Mich. J.L. Reform 735, 759-767 (2011).

[11] See, Illinois Revised Statutes 1845, Chapter 89. Paragraph 4 provides in part, "Marriages may be celebrated, either by a minister of the gospel in regular standing in the church or society to which he belongs, by a judge of any court of record, by a justice of the peace, by any superintendent of any public institution for the education of the deaf and dumb in this state. . . ." This statute was amended on May 30, 1881 and went into effect on July 1, 1881, just one month before Maddie and Vincent Gibson's wedding. Paragraph 6, dealing with licenses, provided in part, "Persons intending to be joined in marriage shall before their marriage obtain a license from the county clerk of the county where such marriage is to take place anything in any general or special law of this State to the contrary notwithstanding." This provision was amended June 3, 1889 and became effective on July 1, 1889.

evidence that on August 2, 1881, the plaintiff had gone from Plattsmouth to Chicago, at defendant's request, in pursuance of a prior correspondence and understanding with him, and **was there married to him privately, without witnesses, by an official who assumed to exercise the functions and perform the usual marriage ceremony, but of whose name, office, or locality she did not inquire, nor was she informed**; that the defendant assured her, at the time, that they were properly married and that it was all right, took her away from the Commercial Hotel, where she had stopped by his direction, to that of the Briggs House, where he introduced her as his wife, treated her in all respects as such, consummated the relationship, and remained together for two or three weeks as husband and wife." *Id.* at 416. (Emphasis supplied) Vincent Gibson vigorously denied this version of the facts.

The Nebraska Supreme Court, looking at the Illinois law, explained, "It is not believed that a private marriage of the manner and form of that in evidence is invalid in Illinois, for the reason that the marriage act is a directory statute, and does not abolish the common law rule of evidence as to marriages, in civil causes, which has been the rule of that state since 1854." *Id.* at 429-30

The Nebraska Supreme Court understood that under the Illinois statute even the presence of a 'clergyman or magistrate' was not the sine qua non of a valid marriage. "It is regarded as settled by judicial authority throughout the United

36

States that marriage, in its legal sense, is a civil contract; that it is not indispensable that a clergyman or magistrate should be present to authorize and confirm the contract in order to give validity to the marriage. Therefore if this was made, as appears, by contract, either in Iowa or Nebraska, followed by celebration and cohabitation in Illinois, it amounts to a valid marriage, and is not voidable at the will of either party, but is as binding as if made in the presence of chosen witnesses at the Christian Altar." *Id.* at 434. And see, Neb. Rev. Stat. § 42-114.[12]

*Gibson* affirmed the validity of an Illinois wedding where no witnesses attended the ceremony and where the officiant may or may not have been a minister or magistrate. The marriage was valid despite those shortcomings, even without a marriage license being produced. The *Gibson* opinion comments about the non-presence of a 'minister' but does not comment on the missing witnesses. These elements of the statute were found to be directory and not mandatory in 1888.

To be sure, the *Gibson* opinion is itself unclear. 'Authorize and confirm' might have been intended to read as 'authenticate and confirm.' The Court did not

---

[12] "No marriage solemnized before any person professing to be a minister of the gospel, shall be deemed or adjudged to be void, nor shall the validity thereof be in any way affected on account of any want of jurisdiction or authority in such supposed minister; Provided, the marriage be consummated with a full belief on the part of the persons so married, or either of them, that they have been lawfully joined in marriage."

say that testimony from a magistrate or minister is necessary to prove the existence of a marriage. To reach the opposite conclusion this Court must edit a Nebraska Supreme Court opinion by replacing "authorize," with "authenticate." The Defendants seek to have the Court amend the statute by adding words.

Common law marriage was abolished by amendments made to Neb. Rev. Stat. § 42-104, which provides in part that "Prior to the solemnization of any marriage in this state, a license for that purpose shall be obtained from a county clerk in the State of Nebraska. . . . No marriage hereafter contracted shall be recognized as valid unless such license has been previously obtained and used within one year from the date of issuance and unless such marriage is solemnized by a person authorized by law to solemnize marriages." That is, an application for a license and a qualified officiant are required. This statute simply does not require the parties to make their declarations in the physical presence of each other.

The plain language of Neb. Rev. Stat. § 42-104 and Neb. Rev. Stat. § 42-109, read in pari materia, demonstrates that physical presence of the prospective spouses is not required by the relevant statutes.[13]

---

[13] The plain language understanding discussed here is reinforced by Neb. Rev. Stat. Ann § 42-103 which lists the circumstances under which a marriage is void. "Marriages are void (1) when either party has a husband or wife living at the time of the marriage, (2) when either party, at the time of marriage, is mentally incompetent to enter into the marriage relation, and (3) when the parties are related to each other as parent and child, grandparent and grandchild, brother and sister of half as well as whole blood, first cousins when of whole blood, uncle and niece,

38

## 2. The Marriage Statute is Directory and Not Mandatory

Neb. Rev. Stat. § 42-109 is directory and not mandatory. Nebraska statutes containing the word "shall" can be mandatory or directory. *State ex rel. Wright v. Lancaster Cty. Rural Pub. Power Dist.*, 130 Neb. 677, 682 266 N.W. 591 (1936) "The legislature did not mean to thus arbitrarily limit the time or to require an impossibility." Where physical presence is an impossibility, such as when the NDCS refuses to transport a prisoner, it becomes impossible for one spouse/prisoner to be in the physical presence of the other spouse/prisoner. It is therefore sensible to understand Neb. Rev. Stat. § 42-109 not to require an impossible physical presence, at least in the context of prisoners confined in different facilities. See, also, *Randall v. DMV*, 10 Neb. App. 469, 632 N.W.2d 799 (2001); *Meister v. Moore*, 96 U.S. 76, 79 (1877); *Collins v. Hoag & Rollins*, 122 Neb. 805, 241 N.W. 766 (1932); *Haggin v. Haggin*, 35 Neb. 375, 53 N.W. 209 (1892).

If the Nebraska Supreme Court can conclude that a marriage without a bona fide minister and without any witnesses would be valid under Nebraska law, it is difficult to see how the unchanged presence element in Neb. Rev. Stat. § 42-109 cannot be satisfied with electronic presence.

---

and aunt and nephew. This subdivision extends to children and relatives born out of wedlock as well as those born in wedlock." Non-presence by a party is not listed as cause for a marriage to be void.

### 3. What Does Presence Mean?

In state court, Defendants sought to define "presence" in a vacuum out of context. Gillpatrick and Wetherell argue that care should be taken when interpreting words lifted from the accompanying text. Statutory language should be read as part of a whole. Words excised from their moorings may be easily misunderstood.

Does the 1866 territorial use of the word "presence" mean visual presence in 2019? If so, blind people cannot marry since they cannot be in view or in sight of each other. Must they be able to hear one another?[14]

Does presence mean proximity?  What minimum distance between parties will qualify for presence? Would it be a valid marriage if the parties were on opposite sides of a glass wall as is common in the visiting area for some jails or correctional facilities? Would it be a valid marriage if they were separated by a

---

[14] The Illinois statue analyzed in *Gibson*, expressly identified as qualified to celebrate a marriage, among others, "any superintendent of any public institution for the education of the deaf and dumb in this state." And for an historical review of efforts to prevent marriages among the blind in the nineteenth century, see, Stalway, Marissa Leigh Slaugher, *Love is not blind: eugenics, blindness, and marriage in the United States, 1840-1940*, Theses and Dissertations, Paper 1741, University of Toledo (2014). Available online: http://www.duxburysystems.org/downloads/library/history/2014_love.pdf (Accessed March 14, 2019)

biomedical barrier because of contagion risk? Would Nebraska permit an e-wedding or a telephonic wedding between a Nebraska person and a deployed service member? Is 'presence' a spiritual word whose meaning depends on the interpretation of the minister? Gillpatrick and Wetherell have submitted an affidavit from Pastor Craig Bock, who avers that an e-wedding is consistent with his faith and his office. Filing 52-8 (Pastor Craig Bock affidavit) at ¶ 8.

Neb. Rev. Stat. § 42-109 still reads "take each other as husband and wife" yet clearly it is a valid marriage if the parties declare solemnly to take each other as 'husband and husband' or as 'wife and wife.' See, *Obergefell v. Hodges*, 135 S. Ct. 1039 (2015). In *Obergefell*, the United States Supreme Court voided statutes of four states on Due Process grounds because those statutes imposed a burden on the exercise of the constitutional right to marry. Those statutes were far less ambiguous than Neb. Rev. Stat. § 42-109. Wetherell and Gillpatrick do not urge this Court to strike down Neb. Rev. Stat. § 42-109 unless it is positively repugnant to the reasonable and constitutional exercise of their qualified right to marry. Their understanding of the statute leaves plenty of room for a minister of the Gospel to unite them in matrimony using present day technology.

Is it presence enough if both make their solemn declaration in the electronic presence of each other, the magistrate or minister and attending witnesses? Neb. Rev. Stat. § 42-109 does not explicitly answer this question. Gillpatrick and

41

Wetherell wish to be careful not to conflate the existence of a constitutional remedy (*Turner*'s fourth inquiry) with the violation of a constitutional right. For present purposes, Gillpatrick and Wetherell are attempting to offer helpful analysis about the meaning of an unchanged statute in a changing world. Must this Court understand the word "presence" to exclude e-presence? Given that Nebraska appellate courts have not answered this precise question but have held that virtually every other word in the statute is directory and not mandatory, there is much sense to rejecting Defendants' convenient literalism.

One cannot ignore that technology has changed over the last 160 years since the original passage of the Nebraska marriage statute. Technological change now allows for an e-presence for prisoners in court hearings. Such technological change eliminates risks to security, order of the institution and to public safety. This panacea does so at no cost to the institution and creates no disruption of the regular penological business of either facility. The statute, reasonably construed, allows for technological innovation to satisfy the presence element. Defendants' interpretation is inflexible and unreasonable.

Others have successfully raised questions which address the question of the meaning of presence in situations where a prisoner seeks to marry. See, *Toms v. Taft*, 338 F.3d 519 (6th Cir. 2003) discussed above. *In re Coats,* 849 A.2d 254 (Pa. Super. Ct. 2004) is a case where the county court refused to issue a marriage

license to the plaintiff, a prisoner, without his physical appearance. The plaintiff

and his fiancée were also both unable to afford to pay the sheriff to transport him

to the clerk's office. Therefore, plaintiff brought a lawsuit seeking either for the

clerk to travel to the prison to conduct a marriage license examination or to do so

by videoconferencing technology. The court upheld the ruling of the lower court,

finding that the clerk does not owe the plaintiff any duty to provide the relief he

requests. The court ruled that *Turner* could not have intended to require

accommodations of prisoner's right to marry regardless of cost or security

concerns. Because the court believed that some action should be taken to

accommodate the prisoner's right to marry, but not by compelling the clerk as he

requested, the case was vacated and remanded for an evidentiary hearing. The

dissent argued that the clerk was required to provide an alternative for plaintiff to

exercise his fundamental right to marry, and that there were several low-cost

options (e.g., sworn affidavits; periodic trips to the prison to issue marriage

licenses).

Two cases from trial courts from the Eighth Circuit have found squarely in

favor of the rights of incarcerated people to marry. *Fuller v. Norman*, 936 F. Supp.

2d 1096 (W.D. Mo. 2013) involved a Missouri statute which required that marriage

licenses be signed "in the presence of the recorder of deeds or their deputy." The

statute was struck down because it significantly interfered with the fundamental

43

right to marry as applied to circumstances where one or both applicants are incarcerated. The state did not demonstrate any sufficiently important state interest that would justify requiring that an incarcerated individual sign a license in the presence of the recorder of deeds. The court pointed out that if the purpose of the statute was to ensure everyone's identity, there were other means to verify the identity of the parties. Accordingly, the court concluded "the 'in presence' requirement of [the statute] is not closely tailored to solely effectuate a sufficiently important state interest as applied to incarcerated person applying for marriage licenses." *Id.* at 1098.  Similarly, *Amos v. Higgins*, 996 F. Supp. 2d 810 (W.D. Mo. 2014) challenged the recorder of deeds' refusal to issue a marriage license unless both parties were present simultaneously per state statute that required each marriage applicant sign the license "in the presence of the recorder of deeds." Plaintiffs were engaged to individuals in prison who could not therefore be present simultaneously. The court found that the "in presence" requirement for marriage license application was unconstitutional as applied to situations where an applicant was physically unable to appear due to incarceration. *Id.* at 813.

This same fact pattern has arisen in other circuits as well. *Jones v. Perry*, 215 F. Supp. 3d 563 (E.D. Ky. 2016) involved Jones, not a prisoner, suing so he could marry a Kentucky prisoner. The county clerk refused to issue them a marriage license, arguing that Kentucky law prohibited her from doing so unless

both people physically appeared to apply. Because plaintiff's fiancée could not

appear at the clerk's office, the couple was unable to marry. Prison officials agreed

with this interpretation of the law and added that they would not transport prisoners

for this reason (applying for a marriage license). Plaintiff brought a lawsuit for a

violation of his fundamental right to marry under the 14th Amendment due process

clause, and asked the court for a preliminary injunction. The court applied a strict

scrutiny standard of review to the policy because it placed a "direct and substantial

burden" on the right to marry. Here, the in-person requirement completely

prevented plaintiff from marrying who he wanted, and also limited him from

marrying a large portion of the population (that being at least all individuals

incarcerated in Kentucky). Therefore, it imposed a "direct and substantial burden"

on plaintiff's right to marry. Next, the court held that the rationale for this policy

failed the strict scrutiny test outlined in *Zablocki* (whether a policy is "supported

by sufficiently important state interests and is closely tailored to effectuate only

those interests," *Zablocki v. Redhail*, 434 U.S. 374, 388 (1978)). The in-person

policy was not closely tailored to effectuate the state's interest in ensuring persons'

legal eligibility to marry. There were also numerous alternatives available to the

county clerk, such as driving to the prison to allow the prisoner to sign the

marriage license or certifying a prison employee to issue marriage licenses for

prisoners. Finding that the policy was unconstitutional as applied to plaintiff, the

45

court issued a permanent injunction requiring the defendant clerk to adopt a procedure that would allow the couple to get married without both physically appearing at the county clerk's office.

Plaintiffs here do not assert that strict scrutiny is required. The denial at issue here fails rational basis review.

### 4. Deference to the State's Reading of the Marriage Statute Is Not Warranted Under These Circumstances

Gillpatrick and Wetherell are not challenging the constitutionality of Neb. Rev. Stat. § 42-109. They are challenging the interpretation given to the statute by the Defendants. Defendants' convenient literalism places an unnecessary burden on Gillpatrick and Wetherell's exercise of a basic constitutional right. The plain words, their context, and their historic meaning provide no support for Defendants' rigid Catch-22.

*Turner* requires a federal court to defer to the expert judgment of a warden concerning the running of a prison. The interpretation of Neb. Rev. Stat. § 42-109 is not an aspect of running a prison. Moreover, the evidence is that Director Frakes did not exercise his expertise in corrections in this case. No claim can be made that the denial here is based on a legitimate penological interest. Director Frakes testified that his lawyers told him what the state statute means. He made no claim that the presence requirement serves a legitimate penological interest. Nor could he, since he also testified that the steps his department takes to maintain security,

good order and protection for the public for weddings held inside his facilities are sufficient to lower such risks to a satisfactory level. Filing 52-9 (Frakes deposition) at 57:9-28. How then could an e-wedding, which raises fewer and lesser security and good order concerns than does a standard wedding require a denial on the basis of a legitimate penological interest? An e-wedding poses no public safety risk. Because the state statute does not require transportation, the Defendants are without a basis for denying the marriage request.

*R.R. Com. of Tex. v. Pullman Co.*, 312 U.S. 496 (1941) and its progeny hold that abstention is appropriate where a state statute is unclear and interpretation of the state statute would be outcome determinative of the federal issue, or at least where such interpretation might materially impact the federal analysis especially where the state statute is amenable to an interpretation which would avoid or modify the federal issue. See, *Robinson v. Omaha*, 866 F.2d 1042, 1043 (8th Cir. 1989). The *Pullman* abstention doctrine requires courts to interpret a state statute to avoid a constitutional confrontation. Understanding Neb. Rev. Stat. § 42-109 to avoid an unnecessary burden on the rights of Gillpatrick and Wetherell to wed is similarly warranted. These questions also illustrate why Neb. Rev. Stat. § 42-109 should be read to be directory and not mandatory. A Nebraska court is required to give a state statute an interpretation which meets constitutional requirements if it can do so reasonably. *State ex rel. Stenberg v. Moore*, 258 Neb. 199, 211, 602

N.W.2d 465 (1999). This Court is under the same prudential instruction. Gillpatrick and Wetherell respectfully argue that Neb. Rev. Stat. § 42-109, for the reasons presented above, does not provide a basis upon which to deny their marriage request.

## D. APPLICABLE ADMINISTRATIVE REGULATIONS

Gillpatrick and Wetherell argue first that the new AR does not apply retroactively to this situation. Their applications for permission to marry were filed while the original regulation was in force. Filing 52-11 (Sabatka-Rine deposition 2019) at 35:18 - 36:4. The revised policy makes substantive and procedural changes. Ultimately, neither the applicable AR nor the current policy prohibit their e-wedding. Moreover, Defendants cannot rely upon their manufacture of a regulation with unlimited discretion during this litigation to pretend that a chance to marry exists. In truth, there is no meaningful alternative. The first AR set standards by which this marriage cannot be denied. The subsequent policy describes an illusion, governed by a standardless and unknown absolute discretion which has never been favorably exercised.

Defendants should not be allowed to rely upon regulations which were amended in the middle of this litigation. Until June 30, 2016, prisoner marriages were processed under AR § 208.01(D)(3), Filing 52-14 (NDCS regulation 208.01). Gillpatrick and Wetherell applied to be married under the procedures and standards

set out in this regulation. The decisional criteria are set out in ¶ 1. "Inmates in the Department's custody will be allowed to marry unless the Warden finds that the marriage presents a threat to security or order of the institution or to public safety." Filing 52-14 (NDCS regulation 208.01). Administrative appeals under this AR have been exhausted.

Gillpatrick and Wetherell have demonstrated that their proposed e-wedding does not trigger any regulatory basis for rejecting their marriage under AR 208.01(D)(3)(a). Their e-wedding would not "present[ ] a threat to security or order of the institution or to public safety." The evidence shows that an e-wedding would pose less risk of an institutional problem than the consistently approved, more traditional method of admitting members of the public to the facility to participate in a wedding ceremony.

Defendants may cite to AR 205.04(1)(D), Filing 52-15 (NDCS Policy 205.04), which replaced AR 208.01(3) on June 30, 2016. AR 205.04(1)(D) provides in part that "Inmates will normally not be permitted to marry other inmates due to the potential risks to the safety, security or good order of the facility. [However, if] an inmate wants to marry another inmate, he or she may file a grievance of a sensitive nature to the Director outlining special circumstances which may warrant an exception. The Director reserves the right to approve

inmate-to-inmate marriages in the case of special circumstances."[15] As argued below, Plaintiffs contend this later-adopted regulation should not apply to them and, in any event, is an insupportable standard when applied to their fundamental right to marry.

There are two changes between the regulations.  First, the new policy added that "all legal and NDCS requirements" must be met. If this addition to the prior regulation means compliance with Neb. Rev. Stat. § 42-109, it adds nothing since that statute does not impose a precondition. It is Plaintiffs' aspiration to have a valid, meaningful e-wedding which will satisfy all of the directives in that statute. If this amendment to the regulations refers to Neb. Rev. Stat. § 42-104, Gillpatrick and Wetherell have obtained a valid marriage license. Filing 52-7 (marriage license). As the affidavit of Pastor Craig Bock shows, the solemnization will be conducted by a "person authorized by law to solemnize marriages." Filing 52-8 (Pastor Craig Bock affidavit) at ¶ 6.

The second change is more substantive, establishing a presumption that prisoners who wish to marry prisoners may not do so because such marriages would pose a danger to the security and good order of the institution(s). This

---

[15] Whether the substantive elements of the current AR or the substantive elements of the prior AR impacts this suit is a matter of state retroactivity law. The procedural changes are of no moment. Defendants cannot plausibly deny that Gillpatrick and Wetherell have exhausted administrative remedies and thereby have satisfied the requirements of the Prison Litigation Reform Act.

change is followed by the creation of a unilateral, undefined and unused discretion arrogated by the Director to allow prisoner to prisoner marriages upon the demonstration of special circumstances. This change is fundamentally unfair and unenforceable. It is standardless and what criteria that might exist is hidden from the prisoners so that they cannot prove their circumstances are special.

Both changes are retroactive, substantive changes which raise serious constitutional concerns. *Landgraf v. Usi Film Prods.*, 511 U.S. 244, 263-73 (1994); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Generally, procedural rules can be changed mid-litigation, but substantive rules cannot. *Durousseau v. Neb. State Racing Com.*, 194 Neb. 288, 231 N.W.2d 566 (1975). The new prisoner to prisoner marriage policy raises the bar in a manner adverse to the exercise of Gillpatrick and Wetherell's constitutional rights. Therefore it should not be applied to this wedding request.

Further, AR 205.04(1)(D) claims to grant a newly minted, unlimited and undefined grant of discretion to the Director to grant a waiver "in the case of special circumstances." This grant of power is standardless and has never been exercised to allow a prisoner to prisoner marriage. Filing 52-11 (Sabatka-Rine deposition 2019) at 42:19-23. Notably, neither regulation forbids the use of teleconferencing technology for a wedding.

51

When Director Frakes was asked to define the phrase "special circumstances," he explained that "There is no definition. It just allows for an opportunity to review and see if something is presented that would cause me to reconsider the general rule to not allow inmates to marry each other." Filing 52-9 (Frakes deposition) at 34:22 - 35:4. When asked what factors might be involved, he listed predatory or victimization behavior, custody level, security level, housing assignment, "some unusual consideration." Filing 52-9 (Frakes deposition) at 35:13-14. Children and possibly estate planning might be considered. "Absent that, I haven't come up with others. But I try to keep an open mind on things." Filing 52-9 (Frakes deposition) at 36:3-4.

Deputy Director Sabatka-Rine, in her 2019 deposition, testified that she does not know what criteria controls the Director's exclusive discretion. Filing 52-11 (Sabatka-Rine deposition 2019) at 61:11 - 62:22. She does not know how whatever criteria may exist is to be weighed. She testified that the Director simply tells her whether an exemption will be granted. Filing 52-11 (Sabatka-Rine deposition 2019) at 66:21 - 67:20. He does not tell her the basis for his denial. Filing 52-11 (Sabatka-Rine deposition 2019) at 67:21 - 68:1; 69:8-20. No set of facts has triggered a successful exercise of discretion. Filing 52-11 (Sabatka-Rine deposition 2019) at 42:19-23.

### D. STANDARD FOR GRANTING SUMMARY JUDGMENT

"Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *In re Acceptance Ins. Cos., Sec. Litig.*, 352 F. Supp. 2d 940 (D. Neb. 2004), citing Fed. R. Civ. P. 56(c) and *Philip v. Ford Motor Co.*, 328 F.3d 1020, 1023 (8th Cir. 2003). The proponent of a motion for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)(quoting Fed. R. Civ. P. 56(c)).

Gillpatrick and Wetherell respectfully assert that the foregoing discussion demonstrates that there is substantial evidence to support their constitutional claim, which if not rebutted or legitimately disputed, satisfies the *Celotex* and Rule 56 standard. They assert that the evidence discussed above and established by the exhibits in their index of evidence provides powerful support for their claim.

## CONCLUSION

Wetherell and Gillpatrick respectfully assert that they have offered sufficient and essentially undisputed evidence that the basis for the rejection of their request to marry was in direct violation of the constitutional right to marry. Permitting an

e-wedding in these circumstances would not violate the administrative regulations. The Director testified that he has authority to authorize this e-wedding. The refusal to permit an e-wedding is not required by the state statute to which the Director refers.

Gillpatrick and Wetherell accept that this court reviews this case with the lens provided by *Turner* and its four factors. Gillpatrick and Wetherell have successfully established that all four factors mean this impenetrable barrier to their marriage is not supported by a legitimate penological interest; there is no alternative means by which they can marry; there is no discernable adverse impact to the facilities, staff, or resources in allowing an e-wedding; and Gillpatrick and Wetherell have offered two reasonable alternatives which carry no cost or inconvenience in the video conferencing or Skype-like use of the institutional internet connection.

Gillpatrick and Wetherell have carried their burden and consequently this Court should grant summary judgment in their favor.

Respectfully submitted,

Niccole Wetherell and Paul Gillpatrick
Plaintiffs

/s/ Michael D. Gooch
_____
Michael D. Gooch #15273
Attorney at Law
7215 North 162nd Street

54

Bennington, NE 68007
(402) 333-0722
mdgooch22@gmail.com

Amy A. Miller NSBA #21050
ACLU Nebraska Foundation
134 S. 13th St. #1010
Lincoln NE 68508
(402) 476-8091 ext. 106
amiller@aclunebraska.org

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Brief in Support of their Motion for Summary Judgment has been served upon Dave Lopez and Ryan S. Post, Assistant Attorneys General, by electronic filing using CM/ECF this 21st day of March 2019.

/s/ Amy Miller

_____

Amy Miller