UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| PAUL GILLPATRICK, and NICCOLE WETHERELL, | ) ) ) | CASE NO.  4:18-cv-03011 |
| Plaintiffs, | ) ) | |
| vs. | ) ) ) | PLAINTIFFS' REPLY BRIEF TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| SCOTT FRAKES, Director, ANGELA FOLTS-OBERLE, Acting Warden, MICHELE CAPPS, Warden,     in their Official Capacities, | ) ) ) ) ) ) | |
| Defendants. | ) | |

Niccole Wetherell and Paul Gillpatrick want to marry. They are both

Nebraska prisoners. The Defendants are the Director of the Nebraska Department

of Correctional Services (NDCS) and the wardens of the facilities where each is

housed. The Defendants are withholding their cooperation and consent. "Aside

from NDCS' denials of their marriage requests, the Plaintiffs are otherwise eligible

to marry." Statement of Material Facts about Which the Defendants Contend There

is No Genuine Dispute: ¶ 22, page 6 of Defendants' Brief, filing # 49.[1] Plaintiffs

---

[1] Along with other concessions in Defendants' proposed undisputed facts, see, ¶ ¶ 10-21 of Defendants' Brief, filing # 49 and Plaintiffs' proposed undisputed facts, ¶ ¶ 1-10; 15-24; and 26-34 of Plaintiffs' Brief, filing # 53, Plaintiffs have established exhaustion as required by the Prison Litigation Reform Act (PLRA).

assert that they have established their right to summary judgment on their constitutional claim.

## I. STANDARDS FOR GRANTING SUMMARY JUDGMENT

Both parties describe essentially the same standard by which a motion for summary judgment or a cross motion for summary judgment should be evaluated. Defendants do not address the PLRA requirements of need, narrowness, and intrusion in order to qualify for injunctive relief. Plaintiffs asserted in their original brief and repeat here that they have met these requirements.

In addressing the constitutionality of the decision to deny Plaintiffs' request to marry, the Court "must distinguish between evidence of disputed facts and disputed matters of professional judgment." *Beard v. Banks*, 548 U.S. 521, 530 (2006). In *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003), the Court indicated that the "burden, moreover, is not on the State to prove the validity of prison regulations, but on the prisoner to disprove it." However, "*Turner* requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective. A prisoner may be able to marshal substantial evidence that, given the importance of the interest, the Policy is not a reasonable one." *Beard v. Banks*, 548 U.S. 521, 535 (2006)

In *Riker v. Lemmon*, 798 F.3d 546, 551 (7th Cir. 2015), the Seventh Circuit recognized that "[a]lthough 'the burden of persuasion is on the prisoner to disprove

the validity of a regulation,' prison officials 'must still articulate their legitimate governmental interest in the regulation" and provide some evidence supporting their concern.'" And see, *Beerheide v. Suthers*, 286 F.3d 1179, 1189 (10th Cir. 2002)("Thus, while *Turner* requires us to defer to the expertise of prison officials, that deference is not absolute. In order to warrant deference, prison officials must present credible evidence to support their stated penological goals.") Plaintiffs assert that the Defendants' incorrect interpretation of a state statute with no penological connection at all fails to articulate a legitimate penological interest.

## II. PLAINTIFFS DIPSUTE DEFENDANTS' STATEMENTS OF FACT

Plaintiffs dispute several of Defendants' proposed statements of fact as inaccurate and note the Defendants have conceded significant portions of Plaintiffs' statement of facts.

Paragraph 25 of Defendants' proposed statement of facts makes the disputed legal conclusion that NDCS Policy, revised in the midst of this litigation, retroactively governs this litigation. The Defendants changed horses with a new regulation in 2016, after Plaintiffs had already filed suit in 2014. Filing 53 (Plaintiffs' Brief in Support of Motion for Summary Judgment, pp. 7, ¶ ¶ 65-67; p. 18, n.7; and pp. 48-52). Such a substantive change in administrative policy raises profound constitutional issues and prevents Plaintiffs from adjusting their position

appropriately. See, *SEC v. Chenery Corp.*, 332 U.S. 194 (1947) and

*Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1146 (10th Cir. 2016) (opinion of now

Justice Gorsuch).

Paragraph 26 of Defendants' proposed statement of facts is not a fact but

argues for conclusions, one irrelevant and one incorrect.  The core of this objection

is stated in the preceding paragraph. Defendants' paragraph 26 claims that the

policy "speaks for itself." And the conclusion that "several of its provisions are

particularly pertinent" is simply wrong.

Paragraph 27 of Defendants' proposed statement of facts is misleading. Even

if the newly minted policy does not "categorically bar inmate-to-inmate

marriages," the 'policy' remains unconstitutionally retroactive in effect. Moreover,

as applied, this policy provides no means by which Plaintiffs could satisfy it.

"Special circumstances" are not defined and have never been found, resulting in no

grants of permission to marry.

Paragraph 29 of Defendants' proposed statement of facts claims that Chief

of Operations Sabatka-Rine testified that any decision by the Director would be

based on the "totality of the circumstances in a particular situation."  Her testimony

was different. She actually said, "But, again, without knowing what circumstances

are presented, it's hard to define what those special circumstances are. But

certainly as <u>part of the totality of our process,</u> we would consider what other

circumstances are identified by the - - the inmate." Filing 52-11 at 61:21 to 62:1 (Sabatka-Rine deposition 2019). (Emphasis supplied) That is, in her deposition testimony Ms. Sabatka-Rine was attempting to describe the process for deciding whether special circumstances might be found sufficient. She was explaining her responsibility for gathering prisoner records and other institutional information, along with shepherding prisoner submissions so that the Director could make his unconstrained decision. She was not describing the elements of a successful special circumstances showing. She was not describing how a prisoner's proffered justifications for seeking a marriage would be evaluated.  Such a showing was not required under the operative administrative regulation anyway, see AR § 208.01(D)(3). Filing 52-14 (NDCS Regulation 208.01).

Chief of Operations Sabatka-Rine, in her 2019 deposition, testified that she does not know what criteria controls the Director's exclusive discretion. Filing 52-11 (Sabatka-Rine deposition 2019) at 61:11 - 62:22. Whatever the actual criteria might be under the new policy, Sabatka-Rine does not know how the criteria is to be weighed. She testified that the Director simply tells her whether an exemption will be granted. Filing 52-11 (Sabatka-Rine deposition 2019) at 66:21 - 67:20. He does not tell her the basis for his denial. Filing 52-11 (Sabatka-Rine deposition 2019) at 67:21 - 68:1; 69:8-20.

Paragraph 30 of Defendants' proposed statement of facts reports that "The record is devoid of any assertion by the Plaintiffs that special circumstances apply to their request to be married." This paragraph fails to mention that no such requirement existed when Plaintiffs asked for permission to marry. Defendants' paragraph 30 also ignores the problems, such as which facts should be marshaled and submitted or what prisoner conduct might be influential, when assessed, using Defendants' new, adverse administrative standard against which inmate to inmate marriage requests are now supposed to be reviewed.

Paragraph 39 of the Defendants' proposed statement of facts falsely claims that "the Defendants relied upon their decades of collective experience working in prison systems." No Defendant said this. The cited portions of the record merely document their work history in corrections, but says nothing about reliance upon this experience in reaching conclusions or as a reason for denying the marriage requests. Director Frakes testified that he was simply relying upon advice of counsel; he never claimed to have exercised his training or experience in correctional administration. Filing 52-9 (Frakes deposition) at 74:11-12.

Finally, Defendants have conceded several significant facts, including the fact that Plaintiffs have completely exhausted their internal administrative remedies in compliance with the PLRA, 42 U.S.C.S. § 1997(a)(e) (Filing 49 at p. 5-6) (Defendants' Brief in support of Motion for Summary Judgment), that

Plaintiffs are otherwise eligible to marry each other (Id. at 6), and the fact that the Plaintiffs have no remedy available to them if Defendants refuse to accommodate their wedding. "Simply put, there are no alternative means for the Plaintiffs to marry." Filing 49 (Defendants' Brief in Support of Motion for Summary Judgment) at p. 22.

### III. *TURNER v. SAFLEY* FACTORS

Both parties address the analytical structure provided by the United States Supreme Court in *Turner v. Safley*, 482 U.S. 78 (1987). Defendants concede the foundational question of whether Plaintiffs retain a constitutional right to marry. Filing 49, p. 14 (Defendants' Brief in Support of Motion for Summary Judgment).

*Turner*, at 89, asks whether the prison regulation or action is "reasonably related to legitimate penological interests." If the answer is no, analysis stops because the policy fails to overcome the constitutional right. Plaintiffs assert that the original administrative regulation described legitimate penological interests, none of which were relevant to Plaintiffs' proposed electronic wedding. The new policy, even if enforced retroactively, does not add a new, legitimate penological interest. The new policy adds only compliance with agency regulations and an implicit reference to a state statute.

The four *Turner* factors, as discussed in Plaintiffs' opening brief, weigh in favor of the Plaintiffs. First, there is no logical connection between the policy of no video-conferenced wedding ceremonies and an at best ambiguous statute. Is the conjured physical presence policy logically connected to a legitimate penological policy. Just the opposite is true. Electronic presence eliminates or substantially reduces potential risks to institutional security, eliminates or substantially reduces risks to institutional good order and eliminates or substantially reduces risks to public safety. The evidence before this Court is that courts and correctional facilities in Nebraska use e-presence in lieu of physical presence in many judicial situations. The evidence establishes that the NDCS uses the same technology in telepsych situations and for some parent child conferences.

This factor favors the Plaintiffs.

Second, Defendants concede that Plaintiffs have no alternative means of becoming married. *Turner*, at 90, asked "whether there are alternative means of exercising the right that remain open to prison inmates?" Defendants' response: "Simply put, there are no alternative means for the Plaintiffs to marry." Filing 49, p. 22 (Defendants' Brief in Support of Motion for Summary Judgment). Defendants can barely acknowledge the consequence. "Thus, the Defendants concede that, at best, this factor is neutral to their position or favors the Plaintiffs." Id.

Plaintiffs assert that this factor strongly supports their claim.

Third, Plaintiffs' evidence, as detailed in their opening brief, establishes that allowing an e-wedding will reduce the impact that an in-person wedding has since the prisoner is simply given a pass and walks from her or his housing unit to the video conference room. There is no cost. Plaintiffs' proposal is the least intrusive means to permit them to wed. Defendants have chosen not to address this undisputed evidence. Their position is an 'all eggs in one basket" mantra of e-presence is not physical presence. They write, "To the extent [Plaintiffs'] proposed remedy is a videoconference ceremony, analyzing the institutional impacts is not even necessary since the ceremony would be per se legally invalid at the outset." Filing 49, p. 22 (Defendants' Brief in Support of Motion for Summary Judgment).

A complete lack of adverse impact strongly favors the Plaintiffs.

Fourth, Plaintiffs have provided unrebutted evidence that there are two necessary, inexpensive, non-intrusive, and narrowly drawn alternatives which allow for the complete exercise of the challenged constitutional right to marry. Those two alternatives are to either have the wedding via video conference technology already in place in both facilities, or to allow the wedding via laptop connected to the institutional wi-fi for electronic solemnization. Plaintiffs' evidence demonstrates that electronic presence represents a necessary, narrow, and

no-cost, alternative which imposes virtually no intrusion into the NDCS and its mission. Defendants decline "to embark on such an exercise."

Plaintiffs assert that this factor strongly supports them. Paul Gillpatrick and Niccole Wetherell urge this Court to find that the Defendants have not articulated a legitimate penological interest to support denying an electronic solemnization. Plaintiffs have offered factual, credible, and substantial evidence which supports their view of the *Turner* factors.

## IV. TRANSPORT FOR THE MARRIAGE IS NOT AT ISSUE

Plaintiffs claim a constitutional right to marry. Defendants unconstitutionally refuse to authorize that marriage. Plaintiffs do not claim that the remedy for that constitutional interference must be transportation.[2] Nevertheless, Defendants vigorously defend against such an unmade claim.

Plaintiffs are not asking for transportation and therefore it is irrelevant whether transporting prisoners from facility to facility for purposes of conducting a wedding ceremony presents security concerns. Under the properly applicable, original administrative regulation, Defendants did not and could not articulate any

---

[2] Director Frakes' 'no transportation' assertion is a red herring considering that Gillpatrick and Wetherell are not asking to be transported. Sabatka-Rine was informed that Gillpatrick and Wetherell were not asking for transportation prior to 2015. Filing 52-10 (Sabatka-Rine deposition 2015) at 43:9-11.

security, order of institution or public safety concern associated with an e-wedding. Defendants make no claim that there was. Even under the new policy, Defendants cannot and do not make security, order or public safety claims. In *Turner*, the Supreme Court dismissed the Missouri prison administrator's security and rehabilitation claims as an exaggerated response. Director Frakes, rightly, does not even make the attempt here.

## V. DEFENDANTS' READING OF STATE LAW IS INCORRECT AND DESERVES NO DEFERENCE

Defendants turn to their interpretation of Neb. Rev. Stat. § 42-109. Defendants claim a penological connection where none exists. Defendants' syllogism is (1) Nebraska marriage law mandates, so Defendants claim, that the parties MUST be in the physical presence[3] of each other when the marriage is solemnized. (2) Defendants then posit that electronic presence is not an acceptable presence. (3) Defendants will not transport plaintiffs for the purpose of a solemnization ceremony. Ergo, Defendants assert there can never be a marriage between these two prisoners because they will prevent the Plaintiffs from being in

---

[3] "When *I* use a word," Humpty Dumpty said, in rather a scornful tone, "it means just what I choose it to mean -- neither more nor less." "The question is," said Alice, "whether you *can* make words mean so many different things." "The question is," said Humpty Dumpty, "which is to be master -- that's all." Lewis Carroll, *Through the Looking-Glass*, chapter 6, p. 115-116 (2013)(Originally published 1872).

the physical presence of the minister or magistrate and the witnesses (and each other). The question becomes whether either step (1) or step (2) is related to the administration of the Nebraska prison system. They are not and therefore neither step triggers a legitimate penological interest. Step (3) remains irrelevant.

Director Frakes' persistent rejection of the proposed e-ceremony is not based upon his belief that it is necessary to ensure the safe and efficient functioning of the NDCS. Defendant Director Frakes' sole basis for denying Plaintiffs' request to marry was "As I understand the law, people must be physically present to be married." Filing 52-9 (Frakes deposition) at 74:11-12.

His further explanation of the basis upon which Gillpatrick's marriage intention form was denied was, "In my memory, though, again, the – the specific denial was based on his location, not being allowed to be transported to another facility." Filing 52-9 (Frakes deposition) at 82:11-14. This was the only basis he could recall. Filing 52-9 (Frakes deposition) at 82:15-20.

*Turner*, at 482 U.S. 85, notes that a prison administrator is entitled to "substantial deference to the professional judgment" exercised in making penological decisions. "Judgments regarding prison security are peculiarly within the province and professional expertise of corrections officials. *Id*., 86.

There is no evidence of any exercise of professional judgment by Director Frakes or his predecessors. Director Frakes did not claim to be an expert on

marriage procedures. He did not claim to have reached his conclusion about the meaning of Neb. Rev. Stat. § 42-109 based on his correctional training and experience.

In *Turner*, at 97, the prison administrator intoned security and rehabilitation, to no avail. Director Frakes does not here claim a security justification for his marriage ban. He does not assert a rehabilitation justification. This record establishes that such assertions even if made are entirely unsupported. Since, no penological interest is involved, no deference is due.

Defendants do not explain where their authority to define and administer a general state statute with no apparent impact on any correctional function comes from. Nebraska statutes do not grant authority for the Director to interpret or administer statutes of general applicability. Neb. Rev. Stat. Ann § 83-171(2) provides that the Nebraska Department of Correctional Services shall "develop policies and programs for the correctional treatment and rehabilitation of persons committed to the department. Neb. Rev. Stat. Ann § 83-173(3) provides that the Department "Establish and administer policies and programs for the operation of the facilities in the department and for the custody, control, safety, correction, and rehabilitation of persons committed to the department." In short, the Nebraska legislature has not delegated authority to the Director to interpret state laws which do not directly impact the operation of NDCS facilities or which do not affect the

custody, safety, correction, and rehabilitation of persons in his custody. His attempt to do so here receives no deference.

As to Defendants' hyperbolic claim about re-writing "presence" out of Nebraska's marriage statute (Filing 49, p. 24), they are just wrong. Plaintiffs argue that presence can be electronic. Plaintiffs assert that the law evolves to accommodate changing realities.[4] Even the meaning of marriage has changed. In *Obergefell v. Hodges*, 576 U.S. ___, 135 S. Ct. 2584 (2015), the very meaning of marriage was expanded to include an entire class of otherwise previously excluded people.

When the United States Supreme Court was confronted with the issue of whether the First Amendment guarantee of freedom of the press included broadcast media, the Court did not write "press" out of the Constitution, it accepted that words evolve. The First Amendment does not literally guarantee that Congress shall enact no law abridging the right to broadcast the news. "Congress shall make no law . . . abridging the freedom of speech, or of the press." Such literalism as would not provide First Amendment protection to the broadcast world did not prevent the United States Supreme Court from "extending" the plain language of the First Amendment's press clause to protect electronic broadcasting. In *United*

_____

[4] "Language . . . is ever changing: no more settled than the sea or the sky." John Moore, <u>You English Words</u>, 202 (1961)

14

*States v. Paramount Pictures, Inc.*, 334 U.S. 131, 166 (1948), the Court rejected the argument that the First Amendment did not cover new technological forms of information sharing. "We have no doubt that moving pictures, like newspapers and radio, are included in the press whose freedom is guaranteed by the First Amendment." And in *Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 102 (1973), in the process of reviewing a self-imposed limitation on the sale of broadcast time for political advertising, the United States Supreme Court, explained, "The problems of regulation are rendered more difficult because the broadcast industry is dynamic in terms of technological change; solutions adequate a decade ago are not necessarily so now, and those acceptable today may well be outmoded 10 years hence." Gillpatrick and Wetherell ask no more. Presence, whatever its meaning in 1866, can easily be understood to include electronic presence today. Furthermore, Director Frakes has no institutional competence and no training or experience which qualifies him to adopt a different definition.

The same can be seen in the evolution of the Sixth Amendment. In *Maryland v. Craig*, 497 U.S. 836 (1990), the United States Supreme Court read the Sixth Amendment right to confrontation ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . .") to permit cross examination using one-way closed-circuit television. The Sixth Amendment then does not always mean face to face, in-court presence.

Gillpatrick and Wetherell offer analysis about the meaning of an unchanged statute in a changing world. Must this Court understand the word "presence" to exclude e-presence? Given that Nebraska appellate courts have not answered this precise question but have held that virtually every other word in the statute is directory and not mandatory, there is much sense to rejecting Defendants' convenient literalism. In addition to *Gibson v. Gibson*, 24 Neb. 394, 39 N.W. 450 (1888), cited in Plaintiffs' opening brief for the proposition that marriage statutes are usually understood to be directory, most states agree. *Parker v. Saileau*, 213 So. 2d 190, 191 (La. Ct. App. 1968); *Carabetta v. Carabetta*, 182 Conn. 344, 346 (1980); *De Potty v. De Potty*, 226 Ark. 881 (1956); *Picarella v. Picarella*, 20 Md. App. 499 (1974); *State v. Ward*, 204 S.C. 210 (1944). These cases do not control the constitutional analysis, of course. However, they amply demonstrate the lack of necessity for interpreting the unchanged Nebraska statute as inflexible, pseudo-literal, and mandatory. See, *Baker v. Baker*, 112 Neb. 738 (1924). One cannot ignore that technology has changed since the original passage of the Nebraska marriage statute more than 160 years ago. Technological change now allows for an e-presence for prisoners in court hearings. Such technological change eliminates risks to security, order of the institution and to public safety. It eliminates the need to transport prisoners in many situations without preventing those prisoners from participating in court proceedings. Such changes do so at no cost to the institution

16

and create no disruption of the regular penological function of either facility. Neb. Rev. Stat. § 42-109, reasonably construed, allows for technological innovation to satisfy the presence element.

Defendants' interpretation is not supported by case law or a reasonable reading of the statute. Defendants do not explain why their incorrect interpretation of the statute describes a legitimate penological interest at all. Inserting the word physical into the statute does not support a legitimate penological interest. Plaintiffs urge this Court not to defer to the Director when deference is not justified by a rational relationship to a legitimate penological interest. Plaintiffs urge this Court not to defer to the Director when Defendants have not demonstrated any competence in the Director to interpret marriage statutes.

Plaintiffs have consistently argued that Neb. Rev. Stat. § 42-109, at a minimum does not forbid an electronic presence during the solemnization of the marriage. In support of this argument, Plaintiffs have looked at a tool of statutory construction: *expression unius personæ est exclusion alterius*. (The mention of one person is the exclusion of another.) Grammatically, presence precedes and modifies a list of people who should be present when a party offers a declaration during the solemnization, magistrate or minister and two witnesses. Plaintiffs have argued that words should be understood in context. Other Nebraska marriage statutes define void marriages but an electronic solemnization is not included in

that list. Read in para materia, the marriage statutes support Plaintiffs. Neb. Rev. Stat. § 42-109 should, consistent with Nebraska law, be interpreted to be directory and not mandatory.

Presence understood to only mean physical presence would create the exact constitutional crisis resolved in so many of the cases cited by Plaintiffs. When a state statute imposes a burden on the exercise of a fundamental constitutional right, the Supremacy Clause of Article VI commands that the state statute yield. See, *Obergefell v. Hodges*, 576 U.S. ___, 135 S. Ct. 2584 (2015); *Toms v. Taft*, 338 F.3d 519 (6th Cir. 2003); *Riker v. Lemmon,* 798 F.3d 546 (7th Cir. 2015); *In re Coats,* 849 A.2d 254 (Pa. Super. Ct. 2004); *Fuller v. Norman*, 936 F. Supp. 2d 1096 (W.D. Mo. 2013); *Amos v. Higgins*, 996 F. Supp. 2d 810 (W.D. Mo. 2014); *Jones v. Perry*, 215 F. Supp. 3d 563 (E.D. Ky. 2016). Plaintiffs do not see a need for this Court to strike down Neb. Rev. Stat. § 42-109, since a reasonable, twenty-first century understanding of presence includes electronic or other constructive presence. This conclusion follows application of the four factors established in *Turner*.

Plaintiffs recognize that the doctrine of constitutional avoidance applies "when 'a serious doubt' is raised about the constitutionality of an act of Congress, [and] 'it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be

avoided.' *Crowell v. Benson*, 285 U.S. 22, 62 (1932)" *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018).[5] The canon of constitutional avoidance "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction." *Clark v. Suarez Martinez*, 543 U.S. 371, 385 (2005). In the absence of more than one plausible construction, the canon simply "'has no application.'" *Warger v. Shauers*, 574 U.S. __, 135 S. Ct. 521, 529 (2014)(quoting *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 494 (2001)). Plaintiffs deny that Neb. Rev. Stat. § 42-109 is capable of two reasonable, constitutional meanings in this context. Plaintiffs argue that the analysis they have provided establishes that the statute does not prohibit electronic presence. Plaintiffs' reading eliminates any claim by the Defendants to a penological interest in obstructing the Plaintiffs' marriage by video conferencing technology.

Defendants argued in state court that presence could be understood only by considering its original meaning, citing an 1838 dictionary. They have abandoned that hopeless argument in favor of lifting one word out of context without

---

[5] Constitutional avoidance is conceptually parallel to the *Pullman* abstention doctrine. *R.R. Com. of Tex. v. Pullman Co.*, 312 U.S. 496 (1941); *Robinson v. Omaha*, 866 F.2d 1042, 1043 (8th Cir. 1989); *State ex rel. Stenberg v. Moore*, 258 Neb. 199, 211, 602 N.W.2d 465 (1999).

considering its context. This single word analysis is inappropriate for all the reasons set out in the Plaintiffs' original brief.

Defendants now cite to a portion of a more contemporary definition. Black's Law Dictionary, Revised Fourth Edition, p. 1346 (1968), defines presence, in full as:

> Act, fact, or state of being in a certain place and not elsewhere, or within sight or call, at hand, or in some place that is being thought of. *London v. Maryland Casualty Co.*, 10 Minn. 581, 299 N.W. 193, 194; the existence of a person in a particular place at a given time particularly with reference to some act done there and then. Besides actual presence, the law recognizes *constructive* presence, which latter may be predicated of a person who, through not on the very spot, was near enough to be accounted present by the law, or who was actively co-operating with another who was actually present. *Mitchell v. Com.*, 33 Grat., Va., 868.

It is easy to understand why the Defendants might have omitted the portion of their dictionary definition which acknowledges the possibility of constructive presence. Both the Ninth Edition (2009) cited by the Defendants and the Tenth Edition (2014) provide, as part of their definition of presence, for constructive presence, although in a somewhat narrower scope than does the 1968 Black's Law Dictionary cited above.

Defendants argue "The Plaintiffs can point to no Nebraska authority—and the Defendants are aware of none—which interprets "presence" to mean anything other than physical presence." Defendants overlook the most persuasive authority: the holding of Lancaster County District Court Judge Robert Otte who ruled in favor of Plaintiffs' marriage and ordered Defendants to permit a marriage by videoconference after duly weighing all the evidence. Filing 52-6 (Order granting Plaintiffs' Motion for Summary Judgment) at p. 12.

## VI. THE CHANGE IN ADMINISTRATIVE POLICIES:
## RETROACTIVE GOAL POST MOVING

Defendants do not discuss the retroactive effect of using their current administrative policy. There are two obvious concerns. Defendants are untroubled about imposing a requirement without providing advance notice to the Plaintiffs and without articulating a standard by which well-intentioned prisoners might comply with the requirement. Defendants unfairly complain that Plaintiffs did not meet a condition created by that new policy which was adopted only after this lawsuit was filed. Defendants do not provide a meaningful definition of "special circumstances" nor explain how any information submitted by prisoners wishing to marry will be evaluated or weighed. The new policy vests unconstrained, undefined discretion in the Director. This discretion is not tethered to a legitimate

penological interest. Finally, the new policy does not itself actually prohibit a video conferenced marriage ceremony.

## VII. REMOVAL TO STATE COURT

Defendants obliquely hint that they wish the case to be returned to state court. Filing 49 (Defendants' Brief in Support of Motion for Summary Judgment) at p. 18, n. 2. The irony should not escape this Court. The case was removed from state court by the Defendants over the objection of the Plaintiffs. See Filings 6, 11 and 23. Of course, Defendants do not actually suggest that the case should be returned to the state trial court, only that they should be allowed to forum shop, issue by issue, by certifying a question to the Nebraska Supreme Court. As noted above, such removal is not necessary because Plaintiffs do not challenge the merits of the state statute and because Lancaster County District Court Judge Robert Otte already ruled that the state statute permits a marriage by videoconference. Filing 52-6 (Order granting Plaintiffs' motion for summary judgment) at p. 12.

## VIII. REMEDY

Plaintiffs have offered credible evidence that either of two alternative remedies are available. They are willing to marry using the NDCS video conferencing equipment. They are willing to marry using the NDCS wi-fi so long

as their attorneys can bring a laptop into the Nebraska State Penitentiary and a laptop into the Nebraska Correctional Center for Women. Both attorneys and Pastor Craig Bock are on the approved visiting lists. They have a valid current marriage license. This Court need not, at this point, make the choice between the offered remedies. Which method the NDCS prefers may be subject to deference, however their obdurate refusal to permit this marriage must stop.

## IX. CONCLUSION

Plaintiffs respectfully assert that the evidence before this Court compels the granting of their Motion for Summary Judgment, Filing 51, and the rejection of the Defendants' Motion for Summary Judgment, Filing 48. Plaintiffs ask this Court to find that:

1. Plaintiffs have shown that their constitutional right to marry has been infringed by these Defendants;

2. Plaintiffs have carried their burden of showing that no legitimate penological interest stands in the way of their marriage;

3. Plaintiffs have shown that Neb. Rev. Stat. § 42-109 does not prohibit an electronic presence for the solemnization of the proposed marriage;

4. Plaintiffs have shown that there is no legitimate penological interest which would be impacted by an e-wedding ceremony;

5. Plaintiffs have shown that there is no rational connection between the proposed marriage and any arguable penological interest;

6. Plaintiffs have shown that there are no alternative means by which Plaintiffs may marry absent accommodation by Defendants;

7. Plaintiffs have shown that there are no adverse institutional impacts associated with Defendants being ordered to accommodate the proposed marriage;

8. Plaintiffs have shown that there are ready alternatives which fully accommodate the Plaintiffs' marriage with no associated intrusion into institutional functioning;

9. Plaintiffs have shown that their proposed electronic marriage is necessary in order to fully vindicate their Constitutional rights;

10. Plaintiffs have shown that their proposed electronic marriage is the narrowest legitimate alternative;

11. Plaintiffs have exhausted administrative remedies;

12. Plaintiffs have demonstrated that they are entitled to judgment as sought in their lawsuit;

13. Defendants have failed to articulate a legitimate penological interest which would be impacted by Plaintiffs' electronic marriage request;

14. Defendants have failed to demonstrate that they are entitled to judgment.

Accordingly, Plaintiffs ask this Court to grant their motion for summary judgment, to overrule Defendants' motion for summary judgment, and to enter a final order permanently enjoining and ordering the Defendants to authorize the use of suitable technology so that the Plaintiffs may wed. Plaintiffs ask this Court to make the findings of need, narrowness and lack of unnecessary intrusion as required by the P.L.R.A.

Plaintiffs also renew their prayer that this Court order the Defendants to pay costs, and expenses associated with this litigation, including reasonable attorneys fees.

Respectfully submitted,

Niccole Wetherell and Paul Gillpatrick
Plaintiffs

/s/ Michael D. Gooch
_____

Michael D. Gooch #15273
Attorney at Law
7215 North 162nd Street
Bennington, NE 68007
(402) 333-0722
mdgooch22@gmail.com

Amy A. Miller NSBA #21050
ACLU Nebraska Foundation
134 South 13th St. #1010
Lincoln NE 68508
(402) 476-8091 ext. 106
amiller@aclunebraska.org

CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing was served upon Dave Lopez, Deputy Solicitor General and Ryan S. Post, Assistant Attorney General, by electronic filing using CM/ECF this 22nd day of April, 2019.

/s/ Amy A. Miller

_____

Amy A. Miller